## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## Paul KATZ and Sylvia Katz, d/b/a Triplex Manufacturing Company, Respondent.

### No. 81–1635.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 30, 1982.

Decided March 7, 1983.

Michael Messitte, Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

Arthur B. Muchin, Dorfman, Cohen, Laner & Muchin, Ltd., Chicago, Ill., for respondent.

Before PELL and WOOD, Circuit Judges, and HILL, Senior District Judge.*

PELL, Circuit Judge.

The National Labor Relations Board (NLRB or Board) petitions for enforcement of its order requiring Paul Katz and Sylvia

* Irving Hill, Senior District Judge for the Central District of California, sitting by designation.

Katz d/b/a Triplex Manufacturing Company (Company) to bargain with District 8, International Association of Machinists and Aerospace Workers, AFL–CIO (Union) upon request.

The primary issue raised by the Company is whether its allegations of preelection misconduct raised a prima facie case for overturning the election. If so, the Company urges, the Acting Regional Director erred in failing to conduct further investigation into the Company's charges that the Union interjected religious, ethnic, and racial slurs into the preelection atmosphere and threatened employees with job loss and violence unless they voted for the Union.[1]

## I. BACKGROUND

The Union filed a representation petition on August 22, 1979. A representation election was held on October 17th of that year. The unit was comprised of shipping, receiving, production, and maintenance employees of the Company. Sixteen employees voted for the Union; fifteen voted against. On October 23, 1979, the Company filed objections to the Union's preelection conduct.[2] In response to a request from the Acting Regional Director, the Company submitted a list of the names of all witnesses together with a brief summary of the testimony of each. Seven signed affidavits were submitted. The Company informed the Regional Office that the witnesses would be made available upon request by the Regional Director.

No one from the Regional Office made contact with the employees who had submitted affidavits. Two months after the objections were filed, the Acting Regional Director issued his "Report on Objections." Although the Acting Regional Director assumed the allegations in the affidavits to be true, his Report overruled the Company's objections and recommended certification of the Union as the exclusive bargaining representative of the unit employees.

On January 21, 1980, the Company filed exceptions to the Report with the NLRB. On April 7, 1980, the Board certified the Union and adopted the Acting Regional Director's finding and recommendations. Three days later, the Company notified the Union that it would seek court review of the Board's decision. The Company stated that it refused to negotiate with the Union.

Ten days later, the Union filed a complaint alleging that the Company's refusal to bargain violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1) (NLRA or Act). On June 4, 1980, the General Counsel filed a motion for summary judgment before the Board. The Board issued a notice to show cause why that motion should not be granted. The Company cited the preelection conduct of the Union and the failure of the Acting Regional Director to investigate or hold a hearing regarding the Company's objections. On September 8, 1980, the Board issued its decision and order, finding that the issues raised by the Company could have been litigated in the prior representation proceeding. The Board found that the Company had not offered any new evidence or presented any other special reason that would require the Board to reexamine the decision made in the representation proceeding. The Board therefore granted the General Counsel's motion for summary judgment. It ordered the Company to cease and desist from interfering, restraining, or coercing employees in the exercise of their rights guaranteed by section 7 of the Act, 29 U.S.C. § 157. The Board also ordered the Company to bargain with the Union upon request, to embody any understanding reached in a signed agreement, and to post the appropriate notice.

---

1. The Company also alleges that the Union attempted to bribe employees by promising to secure money in excess of Workmen's Compensation for work-sustained injuries. Because of our resolution regarding the Company's other allegations, we do not address this issue on appeal.

2. Details of the conduct to which the Company objects are stated *infra*, in the context of the legal issue raised by each objection.

## II. MERITS

In *Mosey Manufacturing Co. v. NLRB*, 701 F.2d 610 (7th Cir.1983) (en banc), this court held that the proper standard of review for issues involving the Board's application of its own rules to factual situations is substantial evidence. *Id.* at 614–15.

Three Board "rules" are relevant to the instant controversy. First, we consider the criteria for whether the Acting Regional Director was required to investigate further the Company's allegations. Two regulations are pertinent: "If Objections are filed to the conduct of the election or conduct affecting the result of the election, . . . the Regional Director shall . . . investigate such objections," 29 C.F.R. § 102.69(c) (1979), and "if it appears to the Regional Director that substantial and material factual issues exist, which, in the exercise of his reasonable discretion, he determines may more appropriately be resolved after a hearing, he shall issue and cause to be served upon the parties a notice of hearing on said issues before a hearing officer," *id.* § 102.69(d). The Board's Case Handling Manual provides guidance on when further investigation is required: "It is incumbent upon the party filing objections . . . to furnish evidence to provide a prima facie case in support thereof before the Region is required to investigate the objection." Case Handling Manual, § 11392.5.

Under *Mosey,* the Board's determination that neither a hearing nor other further investigation was required can stand only if there is substantial evidence to support the conclusion that the Company failed to demonstrate a prima facie case for overturning the election. Before turning to whether the Company's allegations were sufficient, if credited, to result in overturning the election, *NLRB v. Golden Age Beverage Co.,* 415 F.2d 26, 33 (5th Cir.1969), we address a preliminary argument urged by the Company.

The Company suggests that even if the affidavits it submitted to the Acting Regional Director did not state a prima facie case of election impropriety, the Regional Office had some duty, pursuant to 29 C.F.R. § 102.69(c)(d) (1979), to conduct some further investigation. We are unaware of any precedent in this circuit addressing the narrow question whether the Region has a duty to interview witnesses or otherwise gather additional information if the materials supplied by the challenger fail to meet this initial burden. We do note that such a "duty" would be inconsistent with the provision of the Board's Case Handling Manual quoted *supra.* Because we believe that the Company *did* state a prima facie case of election impropriety, we need not and do not discuss further the Company's efforts to expand the investigatory requirement.

### A. Racial, Religious, Ethnic Slurs

#### 1. Factual Allegations

The Company objects to the remarks of a priest made at a Union meeting. The meeting was held at a Catholic church near the Company. The parish priest discussed the movie "Holocaust," which dealt with the Nazis' treatment of Jewish people during World War II. Witness A reported that the priest also said: " 'Paul and Mrs. Katz are Jewish and they're getting rich while we're getting poor.' The priest said 'we should vote yes' and that 'why should we make them rich because Jewish people are rich and we are poor and killing ourselves for them.' " There is no indication that the Union repudiated the priest's remark, either during that meeting or on any subsequent occasion.

The Acting Regional Director stated that there was no other evidence of racial, religious, or ethnic comments during the pre-election period. Sylvia Katz, however, had filed an affidavit stating that during the week of September 24, 1979, employee Carol Delk had told other employees: "Jews killed the Nazis—that the Jews marched in Skokie to keep the Blacks out." Witness A reported in her affidavit that, on election day, employee Carol Delk spread the word that a plant supervisor had said: "All these dumb Mexicans you know what they

want—more money. They are greedy because they never had anything." [3]

### 2. Legal Impact of the Statements

In *Sewell Manufacturing Co.,* 138 N.L.R.B. 66 (1962), the employer had sought to influence his employees to reject the union by emphasizing the union's support of the black civil rights movement. To make his point, the employer circulated a photograph of a white union official dancing with a black woman. The Board set aside the election, stating:

So long ... as a party limits itself to *truthfully* setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals, we shall not set aside an election on this ground. However, the burden will be on the party making use of a racial message to establish that it was truthful and germane, and where there is doubt as to whether the total conduct of such party is within the. described bounds, the doubt will be resolved against him.

*Id.* at 71–72 (emphasis in original) (footnote omitted). As noted by the . Fifth Circuit, the principle underlying the *Sewell* rule is "that workers of one race should not be persuaded to vote for or against a Union on the basis of invidious prejudice they might have against individuals of another race." *NLRB v. Sumter Plywood Corp.,* 535 F.2d 917, 924–25 (5th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538.

In *NLRB v. Silverman's Men's Wear, Inc.,* 656 F.2d 53 (3d Cir.1981), the Third Circuit denied enforcement of a bargaining order issued by the Board. Six days before the union election, the Union's secretary-treasurer had referred to a Company vice-president as a "stingy Jew" in front of twenty employees. The Regional Director had interviewed witnesses, pursuant to the Company's filed objections. He found that no substantial and material factual issues

existed; therefore, he declined to hold a hearing. The Board adopted his recommendation that the objection be overruled and the union certified.

In applying the *Sewell* rule, the *Silverman's* court stated:

[T]he remark, rather than identifying any position of the Employer, can typically serve only to spotlight the minority religion of the Company's principal. Such a remark has no purpose except blatantly to exploit religious prejudices of the voters .... There is no question of truth or falsity in a slur such as this. We can see no reason for the remark except to inflame and incite religious or racial tensions.

656 F.2d at 58. The Third Circuit denied enforcement of the Board's order and remanded the case for a hearing to determine whether the slur was nonetheless harmless. The court noted that the burden would be on the union to prove that the remark had not influenced the election.

The *Silverman's* case is analogous to the case at bar. There is no conceivable way in which either the movie "Holocaust" or the Nazis' treatment of Jewish people during World War II could be relevant to a legitimate campaign issue. To the extent that the priest's comment regarding the wealth of Jewish people, as juxtaposed to the poverty of the employees, might be relevant to the campaign, the point could have been made without resort to a religious slur. In *Silverman's,* the Regional Director had argued on appeal that the "stingy Jew" remark was "marginally germane" to the campaign. The Third Circuit stated: "If the Union leader had desired to stress the executive's parsimony, he could have referred to 'stingy Silverman' or the 'stingy vice-president.' Instead, he allegedly resorted to a disreputable stratagem of bigots. The man's religion was not germane to the proper purposes of this election effort." 656 F.2d at 58 n. 7.

---

**3.** The Acting Regional Director apparently disregarded both these allegations because they were based on hearsay.

The slur in *Silverman's* was made by the secretary-treasurer of the union whereas the offensive remarks in the instant case are attributable to a priest who was not directly authorized to speak for the Union. This distinction does not preclude application of the *Silverman's* rationale to the instant case. The relevant legal inquiry is whether the inflammatory remarks could have impaired the employees' freedom of choice in the subsequent election. *Advertisers Manufacturing Co. v. NLRB*, 677 F.2d 544, 546 (7th Cir.1982). The Company has asserted that a majority of its workers were Spanish Catholics, that Union organizational meetings were regularly held in a Catholic church and that the priest who referred to Katz's religion was actively supporting the Union's organizational efforts. The likelihood that a priest would influence the employees' decision regarding the Union in this context is great. Further, the Union never explicitly repudiated the priest's statements. The fact that the Union continued to hold meetings in the church suggests some further implication of approval of the priest's participation and remarks. The probability that the references to Katz's religion influenced the outcome of the election in the instant case are just as great as the possibility that the characterization of Silverman as a "stingy Jew" influenced the election relevant to the Third Circuit case.

In addition to the remarks attributable to the priest, Sylvia Katz and Witness A alleged in their affidavits that other ethnic/religious references were made during the campaign. Specifically, Carol Delk, who subsequently served as the Union observer at the election, allegedly told other employees that "Jews killed the Nazis—that the Jews marched in Skokie to keep the Blacks out" and spread the rumor that a plant supervisor had said, "All these dumb Mexicans you know what they want—more money. They are greedy because they never had anything." The Acting Regional Director deemed this evidence hearsay and therefore disregarded it. The affidavits had, however, identified actual individuals who heard the statements and the Company indicated that it would make these employees available to the Acting Regional Director so that they could provide direct evidence.

There is authority for the proposition that a Regional Director must investigate a hearsay affidavit. *Anchor Inns v. NLRB*, 644 F.2d 292 (3d Cir.1981); *NLRB v. Campbell Products*, 623 F.2d 876 (3d Cir.1980). In *Anchor Inns*, as in the present case, the Company had claimed that it experienced difficulty in obtaining direct evidence because employees were afraid of the union. The Third Circuit stated: "An outright rejection of a hearsay affidavit in the context of an objection to an election is improper. As evidenced by the facts of this case, there are a variety of circumstances that would render the production of first-hand accounts of unlawful activity extremely difficult, if not impossible." 644 F.2d at 297.

We need not decide whether the Acting Regional Director would have had a duty to investigate further the allegations in the affidavits of Katz and Witness A had they constituted the only allegations of improper racial, religious references during the campaign. These allegations must be considered in light of the priest's remarks. Only one case on which the Board relies suggests that the Acting Regional Director had no duty to inquire further in the face of such allegations. In *Paula Shoe Co.*, 121 N.L.R.B. 673, 675–76 (1958), the Board found that a statement on the bottom of a union leaflet, which read "If you want to avoid that the Jew Sandler [plant manager] continue to mistreat you, vote for [the union]," did not raise a prima facie case for setting aside the election. *Paula Shoe* was, however, decided *before* the Board articulated the *Sewell* rule.

The other cases on which the Board relies are distinguishable from the instant controversy in that the Board concluded the elections need not be set aside *following* an evidentiary hearing. *See Coca Cola Bottling Co.*, 232 N.L.R.B. 717, 718 (1977); *American Enka Co.*, 231 N.L.R.B. 1335, 1342 (1977). These cases suggest, as noted by the *Silverman's* court, that many Regional Directors no longer follow *Paula Shoe*. If

*Paula Shoe* remains viable precedent following *Sewell,* we concur in the observation that it would appear to be "inconsistent with the Board's professed position that 'it does not condone appeals to prejudice.'" *NLRB v. Silverman's Men's Wear, Inc.,* 656 F.2d 53, 58 (3d Cir.1981) (quoting *Paula Shoe Co.,* 121 N.L.R.B. 673, 676 (1958)).

The Board's conclusion that the remarks regarding Katz's religion, made by a priest to a workforce comprised largely of Catholics, were unlikely to have swayed the election is not supported by substantial evidence and appears contrary to *Sewell* and other relevant precedent. Our conclusion that the racial and religious remarks did state a prima facie case for overturning the election is strengthened by the allegations in the two other affidavits which suggest that other irrelevant racial and religious remarks were made during the campaign. On these facts alone we would be inclined to hold that the Board's petition for enforcement must be denied. We need not rest solely on this ground, however, because other serious allegations of misconduct exist in the instant case.

## B. *Threats of Violence and Retaliation*

### 1. Factual Allegations

Witness A, Witness C, and Paul and Sylvia Katz all submitted affidavits reporting threats of physical violence. Witness A reported that a knife-carrying employee had threatened to "beat the hell" out of employees who did not support the Union and had called her a "son of a bitch" for failing to attend Union meetings. Witness A indicated that she was afraid of being beaten by fellow employees who favored the Union.

Witness C also reported that the same pro-Union employee had threatened to beat her. Witness C also had been told that if she continued being chummy with her supervisor, she'd eventually "get whatever is coming."

Paul and Sylvia Katz indicated that other employees, who had not themselves submitted affidavits, had been similarly threat-ened. This view was confirmed by the affidavit of another employee who was ineligible to vote.

Witness A, Witness C, and Katz also reported threats of job loss and retaliation. According to Witness A, Sam Angona, the Union business agent, stated at an organizational meeting that if the employees did not vote for the Union, the Company would make them work harder and would curtail privileges such as getting coffee and going to the restroom.

Carol Delk, allegedly the employee most active on behalf of the Union, reportedly told Witness A that Delk and some of her girlfriends could see to it that Witness A was taken "off [the] line" despite the fact Witness A believed herself to be a good worker. Witness C reported a similar threat made by Delk.

Paul Katz reported that Delk stopped him in the plant on September 5th and stated in a loud voice that she heard the Company would be starting to lay people off.

### 2. Legal Significance of the Allegations

The Acting Regional Director and the Board accorded little weight to the allegations of physical threats, job loss, and retaliation. They reasoned that Delk was not an agent of the Union and that there was no indication Delk, or any other employee, could effectuate a threatened job loss or ascertain how any particular employee voted in the Board-conducted election.

Although the rules of agency are liberally construed in this context, *see, e.g.,* 29 U.S.C. § 152(13); *NLRB v. Urban Telephone Corp.,* 499 F.2d 239 (7th Cir.1974), and we query whether the Union should be permitted to profit from conduct such as that here and yet disavow responsibility for it, it is not necessary for us to hold the Union responsible for Delk's behavior in order to conclude that her activities violated the laboratory conditions required for a union election.

The small size of the unit in which the election was held is extremely relevant. Delk's enthusiasm for the Union, her organ-

izing activities, and her allegedly coercive behavior would naturally be better known in a unit of approximately thirty voters than in a larger group. What might arguably be "isolated incidents" in a setting where hundreds of employees were voting take on greater significance in this more intimate atmosphere.

The Union won the election by only one vote. In such a situation "'even minor misconduct cannot be summarily excused on the ground that it could not have influenced the election.'" *NLRB v. Nixon Gear, Inc.,* 649 F.2d 906, 914 (2d Cir.1981) (quoting *Henderson Trumbull Supply Corp. v. NLRB,* 501 F.2d 1224, 1230 (2d Cir.1974)). In the instant case, it is impossible to say with certainty that not one employee was influenced to vote for the Union only because he or she felt threatened physically or in danger of losing his or her job. When Delk's and Angona's remarks are considered along with the allegations of inflammatory religious and racial references, there is no question that the Company has stated a prima facie case for overturning the election. The failure of the Board to require further investigation into the Company's allegations under these circumstances was contrary to 29 C.F.R. § 102.69(c), (d) and section 11392.5 of the Board's Case Handling Manual.

### III. DISPOSITION

The Company urges this court not to remand the instant case for further proceedings before the Board. The Company stresses that witnesses' memories have likely faded in the three-year period since the election was held. More importantly, due to substantial employee turnover in this relatively small unit, there is a serious question as to whether a majority of current employees desires representation by the Union.

As the Second Circuit has stated in two recent cases involving bargaining orders, a court of appeals must "'grant the relief that furthers the equitable principles which govern judicial action.'" *NLRB v. Connecticut Foundry Co.,* 688 F.2d 871, 881 (2d Cir.1982) (quoting *NLRB v. Nixon Gear, Inc.,* 649 F.2d 906, 914 (2d Cir.1974)). In both *Connecticut Foundry* and *Nixon Gear,* the Second Circuit denied enforcement of the Board's petition without ordering a remand. Both cases involved facts extremely similar to those upon which the Company relies in the present case. We believe that the rationale of *Connecticut Foundry* and *Nixon Gear* is particularly applicable in this case because of the uncertainty that a majority of current employees desires representation by the Union.

### CONCLUSION

The allegations of racial and religious slurs, possible retaliation, and violence against employees who failed to support the Union together state a prima facie case for overturning the election. Because the Company met its initial burden of demonstrating such a prima facie case, the Regional Office should have at least conducted some further investigation into the Company's objections. We are persuaded that the Board neglected to follow the pertinent regulations in adopting the Acting Regional Director's recommendation to overrule the objections and certify the Union.

In the circumstances of this case, a remand to the Board is not warranted. The Board's petition for enforcement is therefore

Denied.