**CARRINGTON SOUTH HEALTH CARE CENTER, INC., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 94–5811, 94-5911.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 11, 1995.

Decided Feb. 28, 1996.

David H. Shaffer (briefed), Roger W. Strassburg, Jr. (argued), Andrew A. Paisley (briefed), Joondeph & Shaffer, Akron, OH, for Carrington South Health Care Center, Inc.

Joan Hoyte-Hayes (briefed), N.L.R.B., Office of General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard (argued), N.L.R.B., Margaret Gaines Neigus (briefed), N.L.R.B., Washington, DC, for N.L.R.B.

Before: MERRITT, Chief Judge; RYAN, Circuit Judge; CLELAND, District Judge.*

CLELAND, District Judge.

Employees at Petitioner's nursing home voted to unionize, and Petitioner filed objec-

* The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

tions to the union's campaign methods with NLRB's Regional Director, asserting that the methods included racially inflammatory appeals. The Regional Director conducted an investigation, but conducted no hearing before overruling Petitioner's objections and certifying the union. The NLRB refused to review the Regional Director's decision, determining that Petitioner "raised no substantial issue warranting review." Petitioner subsequently declined the union's overtures to bargain, and the NLRB ordered Petitioner to cease and desist from refusing to bargain. Petitioner seeks an evidentiary hearing on its objections while the NLRB seeks enforcement of its order. We must determine whether a substantial and material factual issue existed with respect to the Petitioner's complaint. Because we find that factual issues exist, we remand the case for a hearing and refuse enforcement of NLRB's order.

## I.

Petitioner maintains that the union sought unlawfully to arouse and exploit racial feelings among the minorities in the voting unit. Specifically, Petitioner objects to three cartoons and one quote that appeared in some of the twenty-three handbills the union published over the course of the campaign.

The first cartoon, appearing in the April 28, 1993 handbill, shows a white man flipping a coin and saying "I'll take a dozen" while a group of workers looks on. Although the racial composition of the group in the drawing cannot be determined with certainty, many of the workers are clearly intended to appear black. The second cartoon appeared in the May 10 handbill, and depicts a group of people laboring to pull a wagon, in which are a woman in a chair, a man at the rear holding something like a portable radio and a person at the front of the wagon brandishing a whip. The caption has the man with the whip saying "You are employed at my Will!!!" The third cartoon, in a July 21 handbill, shows a white "boss" pointing a nervous-looking black worker to an electric chair, stating "You don't need your union

rep. Just have a seat and we'll discuss your grievance like two rational human beings." All three cartoons are crudely rendered and are obviously unprofessional.

On June 21, 1993, the union handbill contained the following quotation from a famous speech of Dr. Martin Luther King, Jr.:

We've got some difficult days ahead. But it really doesn't matter with me now. Because I've been to the mountain top. Like anybody, I would like to live a long life. Longevity has its place.... But I'm not concerned about that now. I just want to do God's will!

And He's allowed me to go up to the mountain. And I've looked over, and I've seen the Promised Land. I may not get there with you, but I want you to know tonight that we as a people will get to the Promised Land.

So I'm happy tonight. I'm not worried about anything. I'm not fearing any man. 'Mine eyes have seen the glory of the coming of the Lord.

Petitioner points to two factors which it maintains demonstrates that there were racial tensions among the workers prior to the election. First is the voting pattern. The voting unit was comprised of seventy-three black employees (61.9% of the total) and forty-five white employees (38.1%); sixty-eight employees (61.3% of those voting) voted in favor of the union, forty-three (38.7%) against. Petitioner claims that these numbers provide evidence that employees voted largely according to race. Second, Petitioner asserts that racial slurs directed by black workers toward a white security guard shortly after the election demonstrate that racial tensions existed before the election.

## II.

"In reviewing whether the Board properly denied a hearing to the objecting party, the court must determine whether the Board acted arbitrarily in exercising its discretion." *NLRB v. Eurodrive, Inc.,* 724 F.2d 556, 558 (6th Cir.1984) (citing *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946)). The Regional Director must conduct a hearing on objections if the objecting party " 'raises substantial and material factual issues and proffers evidence that establishes a prima facie case for setting aside the election.' " *State Bank of India v. NLRB,* 808 F.2d 526, 538 (7th Cir.1986) (quoting *NLRB v. Chicago Marine Containers, Inc.,* 745 F.2d 493, 496 (7th Cir.1984), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987)). "An election will be set aside when the objecting party demonstrates that pre-election conduct 'seeks to overstress and exacerbate racial feelings' through a deliberate appeal to racial prejudice." *Eurodrive,* 724 F.2d at 558 (quoting *Sewell Mfg. Co.,* 138 N.L.R.B. 66, 71 (1962)).

## III.

### A.

The seminal case in this area is *Sewell, supra.* In *Sewell,* the employer, whose plants were in Georgia, circulated a picture of a white woman dancing with a black man, a picture of a white man (identified as the union leader) dancing with a black woman, and commentary that the union sought to integrate blacks and whites. The employer also sent numerous articles which set forth that the union had donated money to the NAACP and the Congress of Racial Equality, and wrote notes in the margins which said that, if given the opportunity, the employer would vote against the union because he did not want to enable the union to support these causes. The NLRB described the employer's actions as a "deliberate, sustained appeal to racial prejudice." *Sewell,* 138 N.L.R.B. at 70.

The NLRB set aside the election, and in doing so, set the standard by which claims of appeals to racial prejudice are measured. The NLRB characterized its function as "insur[ing] that the voters have the opportunity of exercising a reasoned, untrammeled choice for or against labor organizations seeking representation rights." *Id.* at 69. Therefore, the NLRB seeks to provide as close to "laboratory" conditions as reasonable and to avert any elements that will "prevent or impede a reasoned choice." *Id.* at 69–70. However, the NLRB cannot censor all campaign propaganda. A certain amount of pro-

paganda is tolerated as long as it is "not so misleading as to prevent the exercise of free choice." *Id.* at 70. Where the voters cannot exercise their free choice, the election result is not a reliable indicator of the wishes of the voters. *Id.* at 71.

In its discussion of the racial appeal in *Sewell*, the NLRB set forth the relevant test.

> What we have said indicates our belief that appeals to racial prejudice on matters unrelated to the election issues or to the union's activities are not mere "prattle" or puffing.... The Board does not intend to tolerate as "electoral propaganda" appeals or arguments which can have no purpose except to inflame the racial feelings of voters in the election....
>
> So long, therefore, as a party limits itself to *truthfully* setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant and inflammatory appeals, we shall not set aside an election on this ground.

*Id.* at 71–72 (emphasis in original). Therefore, where a campaign statement has racial overtones, the courts must look at the context to determine whether the statement is related to legitimate election issues and is truthful or whether, on the other hand, the statement deliberately seeks to overstress and exacerbate racial feelings by irrelevant and inflammatory appeals. *Id.* at 72. The party making the racially-based statements has the burden of demonstrating that the statement was "truthful and germane". *Id.* Any doubts are to be resolved in favor of the objecting party. *Id.*

### B.

There have been two main lines of cases stemming from *Sewell*. The first is represented by cases in which a prejudicial remark is directed toward a specific person or group. In these cases, the NLRB generally requires a hearing, because there is no question but that an appeal was made to racial prejudice in a manner unrelated to any legitimate campaign theme.

In *NLRB v. Eurodrive*, 724 F.2d 556 (6th Cir.1984), this court refused to enforce the NLRB's order to Eurodrive to bargain with the union. Eight days before the election the union organizer pointed to the company's sole black employee while stating that the white employees needed the union to protect their jobs just as the black employee had the protection of equal opportunity laws. He promised the employees that the union would succeed in reinstating an employee who had been fired four weeks earlier for harassing the black employee with racial slurs and insults. The organizer, pointing to the black employee, stated that if he cooperated, reinstatement would be assured. *Id.* at 557. This court examined these statements in the context of the racial tensions surrounding the white employee's discharge and looked at the "total conduct" of the organizer. *Id.* at 559. We also noted that it did not matter whether the union's statements created the racial tensions or whether they merely exacerbated existing racial tension—the legal analysis was the same in either case. *Id.* We held that, even though some of the organizer's statements were indirectly related to legitimate campaign issues, it was obvious from the context in which he made the statements that he was purposefully exacerbating racial tensions, and that the NLRB had abused its discretion in denying a hearing. *Id.*

In *NLRB v. Silverman's Men's Wear, Inc.*, 656 F.2d 53 (3d Cir.1981), a union official declared that the company's vice president was a "stingy Jew." Relying on *Sewell*, the Third Circuit mandated that the NLRB conduct a hearing, because the employer had made a prima facie showing that would warrant setting aside the election. *Id.* at 58. The union official's remark, the court said, "rather than identifying any position of the Employer, can typically serve only to spotlight the minority religion of the Company's principal. Such a remark has no purpose except blatantly to exploit religious prejudices of the voters." *Id.*

Similarly, in *NLRB v. Katz*, 701 F.2d 703 (7th Cir.1983), a priest, addressing a union meeting with the permission of the union officials present, discussed the movie "Holocaust" and said that the owners of the company "are Jewish and they're getting rich while we're getting poor.... [W]hy should we make them rich because Jewish people

are rich and we are poor and killing ourselves for them." *Id.* at 705. The court found that these references were unrelated to any legitimate campaign issue. Even though wealth of the employers compared to the poverty of workers could be a legitimate campaign issue, "the point could have been made without resort to a religious slur." *Id.* at 706. *See also Zartic, Inc.,* 315 N.L.R.B. 495 (1994) (repeated use of tape of management official making derogatory statements about Hispanic employees, with use of leaflet linking employer to Ku Klux Klan where KKK had marched on plant demanding Hispanic employees be fired, and where KKK allegedly murdered an employee); *M & M Supermarkets, Inc. v. NLRB,* 818 F.2d 1567, 1569 (11th Cir.1987) (union official's statements included "the damn Jews who run this Company are all alike. They pay us pennies out here in the warehouse, and take all their money to the bank.... Us blacks were out in the cotton field while they, the damned Jews, took their money from the poor hardworking people"); *YKK (U.S.A.), Inc.,* 269 N.L.R.B. 82 (1984) (repeated references to management as "Japs", and "we beat the Japs after Pearl Harbor and we can beat them again.").

### C.

The second line of the *Sewell* progeny comprises cases in which courts generally have not required a hearing, and embraces circumstances in which an union has attributed racial discrimination to the employer, or in which there appears an isolated racial slur.

In *NLRB v. Herbert Halperin Distrib. Corp.,* 826 F.2d 287 (4th Cir.1987), an employee supporting the union told another employee that "the company made work assignments on the basis of race." *Id.* at 289. In addition, an union observer told one employee " 'Boy, you white sons-of-bitches, you are all the same, you're scared to take a stand' ", when that employee would not wear a button supporting the union. The court did not condone the statements, but found them to be no more than "isolated remarks and name-calling among co-workers." They were not particularly "vicious[ ] or pervasive[ ]" and that they did not "display the high de-

gree of identification with the union." *Id.* at 292. The court distinguished *Silverman's, Katz,* and *YKK* by stating that "the remarks in this case were not directed at the owners and do not reflect an attempt to win the election by creating animosity along racial lines." *Id.*

In *State Bank of India v. NLRB,* 808 F.2d 526 (7th Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), a letter distributed by the union stated: "The State Bank of India is trying to keep depressed conditions and low wages for its employees, because most of you are of Indian nationality and other minority groups." The union had justifiably raised discrimination as a campaign issue, and the court found that a single reference to racism on the part of the employers did not warrant a hearing. The court said that in *Sewell* "the employer urged the employees to vote against the union because the union was involved with black people, [but] here the union is urging the employees to vote for the union to prevent discrimination," and thus distinguished *Sewell.* The court also found that "the alleged inflammatory racism [was not] sufficiently close to the core theme of the campaign", *Id.* at 542. *See also NLRB v. Bancroft Mfg. Co.,* 516 F.2d 436 (5th Cir.1975) (court refused to grant hearing or set aside election where union organizers made a few statements to small groups of black employees that blacks "needed to stick together for protection"), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *NLRB v. Baltimore Luggage Co.,* 387 F.2d 744 (4th Cir.1967) (letters and speeches merely equated civil rights, economic opportunity, and personal dignity, and union sought to alter workers' perceptions that unions were opposed to civil rights movement).

### IV.

■ We examine the cartoons in this case within the context of the racial tensions alleged to exist at Petitioner's nursing home. The voting patterns—though they appear to be remarkably correlated with the racial breakdown of the workforce—do not, in this court's estimation, provide evidence of pre-election racial tension. However, the racial

slurs flung at a white security guard just after the election most certainly do.[1] Racial tensions and rancor of the type clearly exemplified by such foul statements simply do not appear suddenly.[2] Petitioner thus had pointed out to the Regional Director evidence showing that the pre-election circumstances included racial discord.

Next, we must consider whether the cartoons served only a legitimate campaign purpose or whether there is a material issue as to whether they "deliberately [sought] to overstress and exacerbate racial feelings by irrelevant and inflammatory appeals." *Sewell*, 138 N.L.R.B. at 71–72. The Regional Director found that the cartoons did not "contain anything of a racially inflammable [sic] nature," but we do not believe the case to be so clear cut.

This case is more akin to the first line of post-*Sewell* cases, discussed in part III.A., *supra*. Although the written captions to two of the cartoons make a passing reference to a legitimate campaign issue,[3] the imagery used in the drawings is, under the circumstances, quite troubling.

The NLRB asserts that there was no racial appeal and nothing inappropriate in the cartoons because each cartoon illustrated the benefits of having a union—that each cartoon referred in some way to a legitimate campaign theme, such as employment at will, negotiated grievance procedures, and lack of respect for employees. Although this may be true, it is also true that the way in which these themes were depicted could also be seen as glaring, graphic appeals to racial prejudice. Each cartoon uses obvious images of bondage or violence visited upon racial minorities by a white majority: a white man purchases a group of black (or mostly black) workers; a group of workers labor as beasts of burden, pulling their superiors in a wagon while being whipped; a black worker is to be summarily executed by a white overlord. The court finds that the imagery used can be construed at a glance as invoking tokens of slavery and racial oppression, and that the cartoons could therefore be construed as a deliberate exacerbation of racial feelings by irrelevant and inflammatory appeals.[4]

The NLRB found that the quote from Martin Luther King, Jr., was "devoid of inflammatory rhetoric or appeals to racial bigotry." The court agrees with this characterization. We must note, however, that the quote is equally devoid of anything related to the cause of bettering the wages and working conditions of the employees in question. The NLRB argues that the words can be construed as encouragement for the employees to be "patient and calm." The excerpt printed by the union, though, contains no such thought. It is simply the portion of the speech most commonly associated with the belief that Dr. King had experienced a kind of premonition on the brink of his impending assassination.[5] In pertinent part, he said

1. The security guard's report indicated that certain black persons in a crowd "celebrating" outside the front door just after the election said "we got our union and your white ass won't be here tomorrow"; "your [sic] mad because your white ass ain't got no job now"; and "now we have a union [and] the white motherfucking bastards have to hire us back and get rid of all the security".

2. It does not matter whether these tensions existed before the campaign or were created by the campaign. *Eurodrive*, 724 F.2d at 559.

3. The cartoon showing a cigar-smoking white man purchasing "a dozen" racial-minority people contains no caption. The coin he is flipping may be intended to be a dime; if so, a message may be inferred that blacks and other minorities are seen as "dime a dozen" commodities and thus nearly worthless. Or perhaps the message could mean that workers generally are viewed as fungible. The former of these implied messages is obviously inflammatory, while the latter is an arguably job-related comment on the sensitivity of the management.

4. We do not believe that the possibility of racial diversity in the group of workers in the first two cartoons somehow insulates the cartoons from Petitioner's attack. It is the strong imagery combined with the clear showing that at least some blacks are intended to be depicted therein which could be construed as a direct appeal to racial bias.

5. One historian has called it "an awe-inspiring moment of premonition and prophecy." Jaroslav Pelikan, *The Things You're Liable to Read in the Bible*, N.Y. Times, Dec. 20, 1992, § 7, at 3.

I would like to live a long life.... I may not get there with you, but ... we as a people will get to the Promised Land....[6]

This was not, as in *Hobco Mfg. Co.,* 164 N.L.R.B. 862, 866, 870 (1967), a telegram from Dr. King to the workers urging them to support the union; this was not, as in *Coca–Cola Bottling Co.,* 273 N.L.R.B. 444, 444, 447 (1984), a reference to Dr. King's work to improve the benefits of other workers; this was not even, as in *NLRB v. Hood Furniture Mfg. Co.,* 941 F.2d 325, 331 (5th Cir.1991), a letter of union endorsement from the late Dr. King's widow. Indeed, nothing in the union's chosen excerpt from this historic and stirring speech seeks to enlighten the listener about unions, wages, benefits, working conditions or any other legitimate concern of labor negotiations. Dr. King, in the quoted portion, was simply and explicitly urging his audience to continue civil rights struggles through the "difficult days ahead" were he to die and fail to reach the destination with them.

Petitioner argues, though not forcefully, that it is the quoted call to "we as a *people*" which, in the context of the racially-charged cartoons, should have been interpreted as racially inflammatory. The Board argues, though not persuasively, that the quote is altogether relevant and served only to bring calm to the pre-election period. We agree with neither position, but we do find that the quote "does not deliberately seek to overstress and exacerbate racial feelings by irrelevant and inflammatory appeals." *Sewell,* 138 N.L.R.B. at 71–72. We find only that, because the quote *could* be interpreted as being directed to a certain "people," *i.e.,* the racial group at issue in this challenged election, the quote has some relevance to the question of whether the racial polarization—which Petitioner claims to have underlain the events in the election—existed. We think the quote is of no more significance than that in this case.

### V.

As *Sewell* clearly sets forth, "where there is doubt as to whether the total conduct of such party is within the described bounds, the doubt will be resolved against him." *Sewell,* 138 N.L.R.B. at 72. Here, there are obvious doubts about the cartoons and the Regional Director should have resolved those doubts in favor of Petitioner. If the cartoons were interpreted in the light most favorable to Petitioner, the drawings would be said to have "no purpose except blatantly to exploit [ ] prejudices of the voters." *Silverman's,* 656 F.2d at 58. There is, therefore, a substantial factual issue requiring a hearing on the objections before a decision is made to certify the election.

We hold that the Petitioner has raised substantial and material factual issues and has proffered evidence that establishes a prima facie case for setting aside the election. We hold further that, when it upheld the Regional Director, the Board acted arbitrarily in exercising its discretion. Accordingly, enforcement of the NLRB's order is DENIED and the proceedings REMANDED to the Regional Director for a hearing on Petitioner's objection to the cartoons.

---

**6.** The allusion is Biblical and refers to Moses being allowed by God only to view the Promised Land—Canaan—from the top of the mountain; he would never reach that destination with his people.