under which it is impossible to determine "the uninhibited desires of the employees" in the election by appealing to racial prejudice. *See Sewell*, 138 NLRB at 72.

In sum, we conclude that substantial evidence supports the Board's finding that the use of racial epithets, in the circumstances presented here, did not constitute an appeal by union proponents to racial prejudice, and we enforce the Board's order.

In addition, we have carefully considered Respondent's arguments that the law of the case doctrine requires that the election be set aside and that the Board incorrectly rejected its objection based on alleged threats during the representation campaign. We find these arguments to be without merit.

### IV.

For the foregoing reasons the Board's petition for enforcement is **GRANTED**.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0263P (6th Cir.)
File Name: 01a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NATIONAL LABOR RELATIONS BOARD,

        *Petitioner,*

*v.*

FOUNDRY DIVISION OF ALCON INDUSTRIES, INC.,

        *Respondent.*

No. 00-5062

On Application for Enforcement of an Order of the National Labor Relations Board.
No. 8-CA-30459.

Argued: May 3, 2001

Decided and Filed: August 9, 2001

Before: JONES and DAUGHTREY, Circuit Judges; ECONOMUS, District Judge.[*]

_____

[*] The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

---

### COUNSEL

---

**ARGUED:**   David Habenstreit, NATIONAL LABOR RELATIONS BOARD, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., for Petitioner. Alan G. Ross, ROSS, BRITTAIN & SCHONBERG, Cleveland, Ohio, for Respondent. **ON BRIEF:** David Habenstreit, NATIONAL LABOR RELATIONS BOARD, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., Aileen A. Armstrong, Usha Dheenan, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Petitioner. Alan G. Ross, David T. Andrews, Fred N. Seleman, ROSS, BRITTAIN & SCHONBERG, Cleveland, Ohio, for Respondent.

---

### OPINION

---

NATHANIEL R. JONES, Circuit Judge.   This case is before the Court on the application of Petitioner National Labor Relations Board ("Board" or "NLRB") to enforce a Board order issued against Respondent Foundry Division of Alcon Industries, Inc. ("Company"). The Company has refused to bargain with the Union based on objections to the underlying representation election. This appeal requires us to determine whether, on the facts of this case, the Board properly concluded that the election should not be overturned on the basis of the use of racial epithets. We hold that there was not a deliberate appeal to racial prejudice and will enforce the Board's bargaining order.

### I.

On May 22, 1997, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW" or "the Union") filed a representation

trying to appeal to racial prejudices held by Knight or that he was trying to exacerbate pre-existing racial tension. Likewise, although Wilson testified that other employees in the voting line were using the word "nigger" along with words like "bitch" and "whore," there is no evidence that they were doing so in an attempt to garner votes for the union based on racial animosity. In fact, Knight testified that it was just a joke and that this kind of language was used so often at the foundry that he was not even sure whether or not Wilson had actually used the word "nigger" and he could not remember who else was using this language.

Thus, this situation is unlike *Sewell*, in which the employer intentionally attempted to appeal to employees' racial prejudices so that they would reject the union on racial grounds. 138 NLRB at 66-68. Nor is it like *Eurodrive* in which the union representative reached out to white employees by promising to force the company to rehire a white employee who had been fired for racially harassing a black employee. By doing this, the representative "placed undue emphasis on a racial issue which [he] must have known would exacerbate pre-existing racial tension among the employees prior to the election." *Eurodrive,* 724 F.2d at 559. Similarly, the situation in the instant case is unlike *Carrington*, in which the union distributed materials that contained "images of bondage or violence visited upon racial minorities by a white majority" and thereby depicted campaign themes such as respect for employees in manner that "could . . . be seen as glaring, graphic appeals to racial prejudice." 76 F.3d at 807.

Although Wilson was encouraging Knight to vote for the union, Wilson's statement does not suggest that members of one race were or could have been "persuaded to vote for or against a union *on the basis of* invidious prejudices they might have against individuals of another race." *Eurodrive*, 724 F.2d at 558 n.4 (emphasis added). Going to the heart of the matter, Knight's statement to Wilson, "Niger [sic] Shorty, I know you're gonna [sic] vote yes," did not create conditions

Contrary to the Company's argument, *Sewell* does not require that the Court set aside the election in this case.[6]

Even when we consider "the context in which the statements were made and the total conduct of the person who made the statements," *Eurodrive*, 724 F.2d at 559 (internal citations omitted), we are unable to find anything to suggest that when Ervin Wilson said to Enrique Knight, "Niger [sic], Shorty, I know you're gonna [sic] vote yes," Wilson was

---

[6] We recognize that the case at bar is different from the cases discussed above in that a third party made the comments at issue here. When determining whether to set aside an election courts place more weight on misconduct by the employer or the union than on conduct by third parties. Generally, when the conduct of third parties is the basis of an election challenge the appropriate test is "whether the actions of a mere Union 'adherent' were 'sufficiently substantial in nature to create a general environment of fear and reprisal such as to render a free choice of representation impossible . . . .'" *NLRB v. Superior Coatings, Inc.*, 839 F.2d 1178, 1180 n.1 (6th Cir. 1988) (quoting *Hickman Harbor Serv. v. NLRB*, 739 F.2d 214, 220 (6th Cir. 1984). Whereas, when the conduct is attributable to the union or the employer the test is whether the conduct "reasonably tend[ed] to interfere with the employee's free and uncoerced choice in the election." *Superior Coatings*, 839 F.2d at 1180 (quoting *Baja's Place*, 268 NLRB 868 (1984)) (alteration in *Superior Coatings*)). It does not appear that the Sixth Circuit has applied the *Sewell* test to the conduct of a third party. Other circuits have done so, and there has been some disagreement as the appropriate standard. *See e.g., NLRB v. Katz*, 701 F.2d 703, 707 (7th Cir. 1983) (applying following test to remarks by third-party: "whether the inflammatory remarks could have impaired the employees' freedom of choice in the subsequent election"); *Did Bldg. Servs., Inc. v. NLRB*, 915 F.2d 490, 498 (9th Cir. 1990) (rejecting *Katz* standard as too inclusive and instead holding that "an employee's appeal to prejudice must so taint the election atmosphere as to render free choice of representation impossible"); *accord M&M Supermarkets, Inc. v. NLRB*, 818 F.2d 1567, 1572-73 (11th Cir. 1987) (stating test as whether the employee's acts "destroyed the atmosphere necessary to the exercise of a free choice in the representation election") (quoting *NLRB v. Carrol Contracting & Ready Mix, Inc.,* 636 F.2d 111, 113 (5th Cir. 1981)). In the case at bar, however, it is unnecessary for the Court to enter this debate because even assuming that the conduct had been attributable to the Union, the conduct does not satisfy the standard for invalidating the election, as expressed in *Sewell, Eurodrive,* and *Carrington.*

---

petition with the NLRB seeking certification as the collective bargaining representative of production and maintenance employees at Foundry Division of Alcon Industries, Inc. Pursuant to a stipulated election agreement, the Board conducted a secret-ballot election on July 11, 1997. Seventy-one out of seventy-five eligible voters cast ballots. Thirty-six votes were cast for the Union and thirty-two were cast against the Union. Three ballots, a number insufficient to affect the outcome, were challenged. The Company filed objections to conduct affecting the results of the election. The Regional Director issued a report recommending that the Board overrule the Company's objections. The Company filed Exceptions to the Regional Director's report, and the NLRB issued a decision and order directing the Regional Director to conduct a hearing regarding the Company's objections.

A Hearing Officer held a two-day hearing and issued a report recommending that the objections be overruled and that a Certification of Representative issue in favor of the Union. Again, the Company filed Exceptions. A three-member panel of the Board issued a supplemental decision and Certification of Representative adopting the hearing officer's findings and recommendations. The Board agreed with the Hearing Officer that the employees' alleged use of racial epithets as they were waiting in line to vote was not objectionable, but said, "In so finding, we rely solely on the fact that the use of such epithets, in the circumstances present here, did not constitute an appeal to racial prejudice." (J.A. at 279.)

Thereafter, the Union requested to bargain collectively with the Company, and the Company refused. As a result, the Union filed an unfair labor practice charge. The NLRB Regional Director issued a Complaint. The Company filed an answer to the Complaint in which the Company admitted refusing the request to bargain but challenged the validity of the representation election. The General Counsel filed a motion for summary judgment on May 26, 1999, and in response the Board issued an order to show cause why the motion should not be granted. The Company filed a

memorandum in opposition to the motion for summary judgment, in which it reasserted its contentions that misconduct destroyed the conditions necessary for an election.

On July 8, 1999, the Board issued a decision and order granting summary judgment and found that the Company had violated Section 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1)). The Board said that the "representation issues raised by Respondent were or could have been litigated in the prior representation proceeding" and that the Company did not offer to produce evidence or allege special circumstances to merit reconsideration. (J.A. at 321.) The Board ordered the Company to bargain upon request from the Union and to post copies of a remedial notice. On January 13, 2000, the Board filed an Application for Enforcement of its order with this Court.

Though other witnesses testified before the Hearing Officer, the testimony of African-American employee Enrico Knight is the most central to the issues we will address in this opinion. Knight testified that he was the second or third person in line to vote and that while he was in line another employee, Ervin Wilson, also African-American, said to him "Niger [sic], Shorty[1], I know you're gonna [sic] vote yes." (J.A. at 206.) (Knight also testified that Wilson may or may not have used the word "nigger.") When asked about the use of racial terms, Knight said that it was just a joke. Further, when asked if other people were using racial terms Knight responded, "At Alcon that's all they do." (J.A. at 206.) He said that in the voting line people were saying things like "Niger [sic], bitch, whore, all that." (J.A. at 207.) He said he could not recall who said these things, "The line was so long, you know, I hear it and I don't hear it, I'm use to hearing it every day from them." (J.A. at 207.) Knight said that African

---

[1]Knight explained that he is called "Shorty." (J.A. at 204.)

should have conducted a hearing on the employer's objections. *Id.* at 808.[4]

Before proceeding further, we feel compelled to forthrightly address the offensive language in question. The word "nigger" or "niger" as set out in the record is a racial slur. This is so irrespective of its common usage and without regard for the race of those who use it.[5] No employer should tolerate use of the language that is apparently commonplace at Respondent's workplace; ie., "nigger," "bitch," "whore," etc. It would behoove a prudent employer and union, concerned with the climate in the workplace and recognizing the diversity of today's workforce, to condemn all such language and counsel employees and members against the use of any terms that denigrate and slur. Nonetheless, the facts involved in the instant case do not allow the Court to apply the very logical and appropriate rule set forth in *Sewell*.

---

[4]In *Carrington*, the employer sought a hearing by the Board on its objections to the election. Thus, the Court had to "determine whether a substantial and material factual issue existed with respect to the [employer's] complaint." 76 F.3d 802, 803 (6th Cir. 1996). In the instant case the Board already conducted a hearing. Nonetheless, the Court's discussion and application of *Sewell* is pertinent and instructive.

[5]That the word "nigger" is a slur is not debatable. The recent edition of the American Heritage Dictionary of the English Language defines "nigger" as follows.

> *Offensive Slang* **1.a.** Used as a disparaging term for a Black person: "*You can only be destroyed by believing that you really are what the white world calls a nigger*" (James Baldwin). **b.** Used as a disparaging term for a member of any dark-skinned people. **2.** Used as a disparaging term for a member of any socially, economically, or politically deprived group of people: "*Gun owners are the new niggers . . . of society*" (John Aquilino).

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).

statements in the context of the racial tension already existing at the time the alleged statements were made and ultimately refused to enforce the Board's bargaining order. *Id.* at 559, 560. The Court held that the union representative had engaged in a "deliberate attempt to exacerbate racial feelings among the employees prior to the election" and that, under the factual circumstances surrounding the conduct, this "was likely to have had an appreciable affect upon the employees' freedom of choice." *Id.* at 560.

In *Carrington South Health Care Center, Inc. v. NLRB*, the Court found that the imagery used in cartoons distributed by the union "[could] be construed at a glance as invoking tokens of slavery and racial oppression, and that the cartoons could therefore be construed as a deliberate exacerbation of racial feelings by irrelevant and inflammatory appeals." 76 F.3d 802, 807 (6th Cir. 1996). In discussing the applicable case law, the Court noted that

> [t]here have been two main lines of cases stemming from *Sewell*. The first is represented by cases in which a prejudicial remark is directed toward a specific person or group. In these cases, the NLRB generally requires a hearing, because there is no question but that an appeal was made to racial prejudice in a manner unrelated to any legitimate campaign theme.

*Id.* at 805. *Eurodrive* is included in this group. *Id.* "The second line of the *Sewell* progeny comprises cases in which courts generally have not required a hearing, and embraces circumstances in which an union has attributed racial discrimination to the employer, or in which there appears an isolated racial slur." *Id.* at 806. The Court placed the facts of *Carrington* in the first group and held that the Board

Americans at the Company often used the word "nigger" and that he did not consider it a racial slur. (J.A. at 226-27.)[2] In fact, later in the hearing Knight testified that he could not remember whether Wilson had used the word "nigger." Knight said, "he might have, I'm not for sure it's been so long. We use it everyday." (J.A. at 229.)

In addition, an employee of the Company's human resource department testified before the Hearing Officer that several years before the vote she had received a few complaints by employees regarding the use of racist terms at the work place. (J.A. at 179-83.)

## II.

"The issue before us is whether the Board, in overruling the Company's objections and certifying the Union, acted within the 'wide degree of discretion' entrusted to it by Congress in resolving questions arising during the course of representation proceedings." *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 313 (6th Cir. 1987) (quoting NLRB v. A.J. Tower Co., 329 U.S. 324, 330 (1946)). As long as the Board's findings of fact are "supported by substantial evidence on the record considered as a whole," we will not disturb them. 29 U.S.C. § 160(e) (2001); *see also NLRB v. Seawin, Inc.*, 248 F.3d 551, 554-55 (6th Cir. 2001). "Substantial evidence consists of such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Kentucky General, Inc. v. NLRB*, 177 F.3d 430, 435 (6th Cir. 1999) (internal quotation omitted). "The Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it *de novo*." *Tony Scott Trucking*, 821 F.2d at 313 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Moreover, "[t]he Board's conclusions of law must be

---

[2] Knight testified that the foundry workforce was primarily African-American. (J.A. at 226.)

affirmed if they are based upon a reasonable defensible construction of the Act." *Loral Defense Systems-Akron v. NLRB*, 200 F.3d 436, 447 (6th Cir. 1999); *see also NLRB v. Dickinson Press, Inc.*, 153 F.3d 282, 284 (6th Cir. 1998) ("The courts must respect the Board's legal interpretations if reasonable.").

### III.

The seminal case in the area of race and union elections is *Sewell Manufacturing Co.*, 138 NLRB 66 (1962). In that case, during a representation election at plants in Georgia, the employer distributed to its employees various items relating to race including a picture of a white woman dancing with a black man, a picture of a black woman dancing with a white man identified as a union leader, and articles and letters stating that the union donated money to the National Association for the Advancement of Colored People and the Congress of Racial Equality, including a letter explaining that the president of the employer company would vote against the union because of its contributions to these organizations. *Id.* at 66-68. The Board recognized that its function is to,

> conduct elections in which the employees have the opportunity to cast their ballots for or against a labor organization in an atmosphere conducive to the sober and informed exercise of the franchise, free not only from interference, restraint, or coercion violative of the Act, but also from other elements which prevent or impede a reasoned choice.

*Id.* at 70. In *Sewell* the Board held that an appeal to racial prejudice could prevent reasoned choice. The Board explained:

> We take it as datum that prejudice based on color is a powerful emotional force. We think it also indisputable that a deliberate appeal to such prejudice is not intended or calculated to encourage the reasoning faculty.

> What we have said indicates our belief that appeals to racial prejudice on matters unrelated to the election issues or to the union's activities are not mere "prattle" or puffing. They have no place in Board electoral campaigns. They inject an element which is destructive of the very purpose of an election. They create conditions which make impossible a sober, informed exercise of the franchise. The Board does not intend to tolerate as "electoral propaganda" appeals or arguments which can have no purpose except to inflame the racial feelings of voters in the election.

*Id.* at 71. The Board further stated, however, that if "a party limits itself to *truthfully* setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals, we shall not set aside an election on this ground." *Id.* at 71-72.[3] Applying these rules to the facts of that case, the Board determined that "the Employer's propaganda directed to race exceeded permission limits and so inflamed and tainted the atmosphere in which the election was held that a reasoned basis for choosing or rejecting a bargaining representative was an impossibility." *Id.* at 72.

The Sixth Circuit has applied this rule in several cases. For instance, in *NLRB v. Eurodrive, Inc.,* a union representative told white employees prior to the election that unlike the only black employee the white employees needed the union to protect their jobs. 724 F.2d 556, 557 (6th Cir. 1984). The representative cited as an example a situation involving a white employee who had recently been fired for racial harassment and insisted that the union would get him rehired. *Id.* at 557. The Court considered it necessary to view the

---

[3]The Board further explained that "the burden will be on the party making use of a racial message to establish that it was truthful and germane, and where there is doubt as to whether the total conduct of such party is within the described bounds, the doubt will be resolved against him." *Sewell Mfg. Co.*, 138 NLRB 66, 72 (1962).