NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

COLUMBIA CABLE TV COMPANY, INC., Respondent.

No. 87–2664.

United States Court of Appeals, Fourth Circuit.

Argued May 2, 1988.

Decided Sept. 7, 1988.

Elizabeth A. Dunn (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Susan L. Williams, Supervisory Atty., N.L.R.B., Washington, D.C., on brief), for petitioner.

R. Lee Creasman, Jr. (James C. Hoover, Clark, Paul, Hoover & Mallard, Atlanta, Ga., on brief), for respondent.

Before HALL and WILKINSON, Circuit Judges, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

K.K. HALL, Circuit Judge:

The National Labor Relations Board ("NLRB" or "the Board") petitions for enforcement of its order requiring Columbia Cable TV Company, Inc. ("Columbia" or, "the Company") to bargain with General Drivers, Warehousemen and Helpers Local No. 509 ("the Union") as the exclusive representative of Columbia's employees. The Company opposes enforcement contending that the certification election was fatally tainted by a company supervisor's pro-union activity. Finding that the Board did not abuse its discretion by certifying the Union as an exclusive representative, we grant enforcement of the order.

## I.

Columbia, a South Carolina Corporation, is engaged in the receipt and distribution of local and distant television satellite signals at its facilities in Columbia and West Columbia, South Carolina. On May 7, 1986, the Union filed a representation petition with the Board seeking certification as the exclusive collective bargaining representative of Columbia's employees. The Board then conducted a secret ballot election in the appropriate unit of the Company's employees on June 2, 1986, which was won by the Union by a vote of 30 to 13. There were six challenged ballots, a number insufficient to affect the results of the election.

The Company subsequently filed a number of objections with the Regional Director of the Board challenging the validity of the election. Of particular relevance to this appeal is the Company's allegation that pro-union activity of a former supervisor, Jim Barnes, created an atmosphere of fear and reprisal that made a free election impossible. According to the Company, Barnes, then the second in command at the Columbia facility, informed certain employees in the early spring of 1986 that the General Manager, Bud Tibshrany, had developed a "hit list" of employees targeted for termination. Barnes further informed the employees that he had been directed to "build a file" on certain individuals to assist in the terminations, but instead intended to resign in protest. Barnes maintained that only by supporting a union would the employees be able to protect themselves.

Barnes, in fact, did resign from the Company on April 25, 1986. At a going-away party, he generally reiterated his belief that the employees needed a union to protect themselves from Tibshrany. An employee later testified that Barnes informed him at the party that he was on the General Manager's "hit list". It also appears that after his resignation and after the filing of the Union's petition, Barnes contacted at least one other employee and warned that person about the "hit list".

In rejecting the Company's claim that Barnes' conduct had tainted the election, the Regional Director noted that approximately one week after Barnes' resignation, Tibshrany met with Columbia employees and specifically denied that there was any "hit list". Tipshrany later informed an employee who had been warned by Barnes that Barnes' statement was "a barrel of bull". The Director observed that the Company also had more than ample opportunity to undertake further remedial action to disavow Barnes' statements before the June election if it had desired to do so. Finally, the Director recommended that the Company's objection be overruled because the pro-union activity had occurred before the filing of the representation petition and, thus, was not relevant to the fairness of the post-petition election.

After considering both the Regional Director's report and accompanying recommendations as well as the Company's exceptions to that report, the Board concluded that the Union should be certified as the bargaining representatives. The Board modified the Director's factual findings slightly by observing that some of Barnes' pro-union activity had taken place after the filing of the Union's petition. The Board determined, however, that even if *all* of Barnes' conduct, both pre- and post-petition were examined, there was no justification for setting aside the election.[1]

Following the Board's decision, the Union requested that the Company engage in collective bargaining. Columbia refused and the Union filed an unfair labor practice charge with NLRB alleging a violation of Sections 8(a)(5) and (1) of the National Labor Relations Act. After the Union's position was upheld on a motion for summary judgment, the Board issued an order requiring the Company to cease and desist its unfair labor practice, to bargain with the Union upon request, and to embody the result of such bargaining in a written agreement. The Board now asks that we enforce that order.

## II.

In opposing the application for enforcement, Columbia contends that the Board did not properly assess the coercive impact of Barnes' conduct upon the fairness of the election. The Company argues that the Board's order conflicts with its own decision in *MKD Distributors d/b/a Dreyer's Grand Ice Cream Northwest*, 279 N.L.R.B. No. 107 (April 30, 1986) which explicitly recognized that pro-union activity by a supervisor tends "to effectively coerce employees in the exercise of their free choice...." 279 N.L.R.B. No. 107 at 3. The Company also contends that the Board erred in rejecting its position on summary

judgment without first conducting an administrative hearing. We find the Company's arguments unpersuasive.

 The results of a Board-supervised representation election are presumptively valid.[2] The Board's determination that an election has properly resulted in a vote for union representation is discretionary and entitled to great deference. It can be overturned only by a showing of "specific evidence not only that the alleged acts of interference occurred but also that such acts sufficiently inhibited the free choice of employees as to affect materially the results of the election." *NLRB v. Hydrotherm, Inc.*, 824 F.2d 332, 334 (4th Cir.1987)

It is true, as the Company argues, that both this court in *Turner's Express, Inc. v. NLRB*, 456 F.2d 289 (4th Cir.1972) and the Board in *MKD, supra* have found pro-union conduct by supervisory personnel inhibiting enough to invalidate an election. There is, however, a significant factual distinction between the circumstances present in those cases and the matter before us now. In both *Turner* and *MKD*, the pro-union activity was performed without the employers' knowledge by personnel who remained in supervisory positions throughout the election period. Since employees would almost certainly assume that such supervisors would be privy to confidential management policy and, thus, particularly credible when threatening retaliation if the union campaign failed, a coercive impact would be virtually inevitable. See *MKD, supra.*

 In the instant case, however, Barnes left his position well before the representation campaign even began. While his statements may well have retained some persuasive influence, he no longer possessed the intimate knowledge of day to day company policy that rendered the supervisory conduct in *MKD* and *Turner* so

---

1. The Board noted but chose not to apply the rule of Ideal Electric & Manufacturing Co., 134 N.L.R.B. 1275 (1961) which generally limits consideration of coercive conduct to events occurring during the "critical period" between the filing of the representation petition and the election.

2. "The presumption is that ballots cast under the safeguards provided by Board procedure reflect the true desires of the participating employees." *NLRB v. Zelrich Co.*, 344 F.2d 1011, 1115 (5th Cir.1965).

pernicious. There was, therefore, a substantially diminished likelihood that Columbia's employees felt compelled to cast a pro-union vote in order to avoid certain company retaliation. We are aware of no decision and none has been cited to us by the Company in which a representation election has been set aside on the basis of pro-union activity by a *former* supervisor whose employment had ended before the representation campaign.[3]

We also note, as did the Board, that Columbia, having learned of Barnes' statements, was under an affirmative duty to disavow them. *NLRB v. Manufacturer's Packaging Co., Inc.* 645 F.2d 223, 226 (4th Cir.1981). Columbia's General Manager did, in fact, directly repudiate Barnes on at least two occasions. The Company argues that Tibshrany's attempt to dissipate the coercive impact of Barnes' actions was unavailing and that further effort at disavowal would have been futile in light of the dramatic effect achieved by Barnes' resignation. Accepting the Company's argument, however, leads to the inevitable and utterly untenable conclusion that no election resulting in a vote for union representation would have been valid after Barnes' resignation. We are unwilling to accord so little confidence in the ability of employees to weigh competing information when making a representation choice. Nor are we prepared to permit an employer to evade its responsibility to contest adverse information aggressively in a representation campaign by asserting futility as grounds for an after-the-fact challenge to the election.

This court has always stood willing to overturn representation elections when supervisory participation on behalf of the union has truly been coercive. There is, however, a substantial potential for employer abuse in this area that mandates judicial caution. Although there is no indication that it occurred in this instance, an employer might well contest a representation petition on the merits and then seek a second bite of the apple by objecting to the result based on the "fifth column" activity of its own supervisors. To guard against this possibility, we are convinced that an election should be set aside only when the coercive impact is clear and an employer, aware of the improper activity, has made a full and sincere effort at dissipating that impact. We find neither circumstance present in this case.

We likewise see no merit in Columbia's contention that the Board was required to hold an administrative hearing on its objections to the election. A hearing is required only when there are unresolved factual issues of a material nature. E.g. *ARA Services, Inc. v. NLRB,* 712 F.2d 936, 937 (4th Cir.1983). We agree with the Board that Columbia's objections did not present "evidence sufficient *prima facie* to set aside the balloting" *Id.,* and, thus, render summary judgment inappropriate.

The Board assumed for purposes of decision that all of the conduct charged to Barnes by the Company did, in fact, take place. At most, the Company's proffered evidence, including an affidavit by Barnes, was cumulative and provided no new basis for challenging the election. We, therefore, see no error in the Board's summary disposition of the Company's objections.

### III.

We can perceive no reason to regard the result of the June 2, 1986 representation election as anything but the free and informed choice of Columbia's employees. Accordingly, the Board's application for enforcement of its order is granted.

**ENFORCEMENT GRANTED.**

---

**3.** Even the unpublished decision of this Court in *NLRB v. River Walk Manor, Inc.,* No. 86–3887 (4th Cir. October 26, 1987) [833 F.2d 310 (table) ] which, in contravention of our Internal Operating Procedure, the Company has cited extensively, involved supervisors who remained employed and engaged in pro-union activity throughout the representation campaign.