**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

No. 97-1425

COCA-COLA BOTTLING COMPANY
CONSOLIDATED,
Respondent.

On Application for Enforcement of an Order
of the National Labor Relations Board.
(9-CA-34465)

Argued: October 1, 1997

Decided: December 29, 1997

Before MURNAGHAN and NIEMEYER, Circuit Judges, and
MAGILL, Senior Circuit Judge of the United States Court of
Appeals for the Eighth Circuit, sitting by designation.

_____

Enforcement granted by published opinion. Judge Murnaghan wrote
the opinion, in which Judge Niemeyer and Senior Judge Magill
joined.

_____

**COUNSEL**

**ARGUED:** Joan Elizabeth Hoyte, NATIONAL LABOR RELA-
TIONS BOARD, Washington, D.C., for Petitioner. Michael Wade
Bishop, EDWARDS, BALLARD, BISHOP, STURM, CLARK &
KEIM, P.A., Spartanburg, South Carolina, for Respondent. **ON**

**BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Peter Winkler, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. S. Clay Keim, BALLARD, BISHOP, STURM, CLARK & KEIM, P.A., Spartanburg, South Carolina, for Respondent.

_____

## OPINION

MURNAGHAN, Circuit Judge:

In this proceeding, we confront a challenge to the National Labor Relations Board's certification of the Chauffeurs, Teamsters and Helpers, Local Union No. 175, as the exclusive bargaining representative of the employees of Coca-Cola's Logan, West Virginia soft-drink distribution facility. A Board-certified election was held on August 2, 1996, and the Union prevailed by a vote of eighteen to nine. The Company filed timely objections to the election, alleging that the Union had coerced employees to vote for it by granting and promising benefits conditioned upon a Union victory and by creating an atmosphere of fear and intimidation in the pre-election environment. The hearing officer considered these contentions and rejected them. The Board adopted the hearing officer's recommendations and, on September 30, 1996, issued its Decision and Certification of Representation, thereby certifying the Union as exclusive bargaining representative.

In an effort to obtain judicial review of the Board's certification, the Company refused to bargain with the Union. Thereafter, the Union filed charges pursuant to §§ 8(a)(5) and 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1988). In its answer to this complaint, the Company admitted that it had refused to bargain, but challenged the validity of the Board's decision to certify the Union. The General Counsel moved for summary judgment and, on January 27, 1997, the Board granted the motion and issued an order requiring the Company to bargain. Pursuant to 29 U.S.C. § 160(e), the Board petitions this Court for enforcement. Because we conclude that the Union was properly certified, we hereby grant enforcement.

2

I.

The Company operates a soft drink distribution facility in Logan, West Virginia. On June 1, 1996, the Union filed a petition for a Board-certified representation election. On June 26, 1996, employee David "Randy" Atkins sent a letter to the Company's Plant Manager, Luther Burdette. In the letter, Atkins identified sixteen employees as the "Internal Organizing Committee" for the union organization effort. According to Atkins, his purpose in sending the letter was to protect the sixteen named employees from retaliation by the Company for any of their union organizing activities.

In July 1996, employees requested that the Union provide them with T-shirts and other items of pro-union paraphernalia. The Union complied and, on June 30, 1996, made T-shirts available to employees following a union organization meeting. The shirts were placed in a box at the back of the meeting room and at the end of the meeting employees were told they could go to the back of the room and take a shirt if they so desired. The T-shirts were supplied in two varieties, one with a Teamsters logo on the front and the other with the logo and the words "Bad Boy" stenciled on the back. The shirts ranged in value from $6.10 to $7.00 each.

At the same meeting on June 30, Union members from the local chapter answered questions and provided employees with information regarding various issues, including employee pension plans. The details of what employees were told regarding pension benefits is a matter of dispute. The Company claims employees were promised ten years of advanced credit toward a union pension plan if the Union won the election. The Union denies that such promises were made.

On July 6, 1996, union organizers held another meeting. Among other things which occurred during this meeting, one thing is relevant to this appeal. Employee Kendall Dingess attended this meeting and brought with him former employee Bill Atkins (no relation to Randy Atkins), who had previously worked for Coca-Cola at a different facility. Dingess asked Bill Atkins to speak to employees about how Atkins was treated when he was at the Company, and why he believed Coke employees would be better off with a union. Atkins's remarks were brief, and there are differing stories as to what Atkins

3

actually said. The Company claims Atkins told employees he had been terminated from Coke for supporting the union in a prior election effort. The Union denies that Atkins made any such remark.

During the election, some union supporters experienced a fear of losing their jobs if the Union lost the election. They believed the Company might retaliate against them for having supported the Union. Some employees discussed these fears with their co-workers.

II.

Our consideration of the Board's enforcement petition is governed by well-established principles of law. Congress has entrusted the NLRB with broad discretion to establish procedures and safeguards "to insure the fair and free choice of bargaining representatives by employees." See N.L.R.B. v. A.J. Tower Co. , 329 U.S. 324, 330 (1946). As a result, this Court treats the outcome of a Board-certified election as presumptively valid. See N.L.R.B. v. VSA, Inc., 24 F.3d 588, 591 (4th Cir.), cert. denied, 513 U.S. 1041 (1994) (citations omitted). In seeking to have an election set aside, the objecting party bears a "heavy burden." See N.L.R.B. v. Herbert Halperin Distrib. Corp., 826 F.2d 287, 290 (4th Cir. 1987). To succeed, it must be shown by specific evidence that (1) the alleged acts did in fact occur and (2) such acts "sufficiently inhibited the free choice of employees" so as to affect materially the results of the election. N.L.R.B. v. Hydrotherm, Inc., 824 F.2d 332, 334 (4th Cir. 1987) (quoting N.L.R.B. v. Handy Hardware Wholesale, Inc., 542 F.2d 935, 938 (5th Cir. 1976), cert. denied, 431 U.S. 954 (1977)).

In evaluating alleged misconduct to determine whether the requisite prejudice has occurred, this Court is mindful of the real world environment in which an election takes place. Although the Board strives to maintain "laboratory conditions" in elections, see General Shoe Corp., 77 N.L.R.B. 124, 127 (1948), "clinical asepsis is an unattainable goal," VSA, 24 F.3d at 595 (citations omitted). An election is by its nature a rough and tumble affair, and a certain amount of "exaggerations, hyperbole, and appeals to emotions" are to be expected. Id. at 595 (quoting Schneider Mills, Inc. v. N.L.R.B., 390 F.2d 375, 379 (4th Cir. 1968) (en banc)).

4

Given the complexity of the employment relationship, determining whether certain conduct is coercive "require[s] a quality and degree of expertise uniquely within the domain of the Board." Hydrotherm, 824 F.2d at 334. Where, as here, the Board has held a hearing on a party's election objections, on appeal the Board's findings of fact are "conclusive" if supported by substantial evidence. See National Labor Relations Act, 29 U.S.C. § 160(e). This Court will not substitute for the Board its judgment regarding factual findings, especially with respect to matters bearing on witness credibility. See Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951); N.L.R.B. v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983). The ultimate determination of an election's validity rests within the "sound discretion of the Board," and this Court will reverse only upon a finding of abuse of discretion. See N.L.R.B. v. Manufacturer's Packaging Co., 645 F.2d 223, 225 (4th Cir. 1981) (citations omitted). Therefore, "[i]f the Board's decision was reasonable and based on substantial evidence in the record considered as a whole, our inquiry is at an end." Hydrotherm, 824 F.2d at 334.

III.

In its opposition to enforcement of the Board's order, the Company presents three grounds on which it contends the election must be set aside. First, the Company argues that the Union engaged in coercion by encouraging employees to believe they would be terminated by the Company for their pro-union activities if the Union lost the election. According to the Company, the Union "regularly and consistently threatened employees" by representing to them that employees who supported a previous union organization effort had been discharged because of their pro-union activities; that everyone who supported the Union would be fired if the Company won the election; and that the only way to preserve employment with the Company was to make sure the Union won the election. These threats, the Company maintains, spread fear and uncertainty among employees, an atmosphere which the Union allegedly exacerbated by sending a letter to the Company's management identifying union supporters.

The Board rejected the Company's allegations on this point, and we agree. In the hearing below, the Company called eleven employees as witnesses. Not a single witness corroborated the employer's

5

allegations that anyone connected with the Union-- either directly or in a representative capacity -- engaged in the sort of conduct the Company alleges. While it is true that some witnesses testified that they experienced fear of losing their jobs as a result of their support of the Union, these employees testified that their fears were based on their own perceptions of how companies sometimes react to union organizing efforts and their own opinions regarding why some former union supporters were no longer with the Company. Not a single employee testified to hearing rumors that pro-union employees would be terminated or, significantly, that conduct on the part of the Union was in any way responsible for creating an atmosphere in which employees felt compelled to vote for the Union.

The Company relies heavily on the allegation that former Coke employee, Bill Atkins, who spoke at a gathering of pro-union employees, told those at the gathering that he was fired for supporting a previous union organization effort. Yet, there is no evidence in the record that Bill Atkins, who attended the meeting at the request of employee Kendall Dingess, told anyone other than Dingess that Atkins believed he was terminated for his support of the union. Not a single employee who attended the meeting testified to having heard Bill Atkins say that he was terminated from Coca-Cola or why such a termination may have occurred. Even Dingess's own testimony is ambiguous as to whether Atkins stated his opinion regarding the reason for his termination to Dingess in private or to the group of employees gathered at the meeting. Furthermore, the Company has provided no evidence that any statement which may have been made by Bill Atkins later became the subject of rumors, let alone fear, among employees.

We agree with the Board that the Company has failed to carry its burden of establishing, as a factual matter, that the alleged misconduct occurred. We therefore decline to deny enforcement of the Board's order on this ground.

IV.

The Company's next objection is that the Union, by distributing T-shirts at an employee meeting one month before the election, made employees feel obligated to vote for the Union. Although the Union

6

acknowledges that it distributed T-shirts, it denies that this activity had any prejudicial effect on the outcome of the election.

The proper starting point for a case of this nature is the Board's decision in Wagner Electric Corp., 167 N.L.R.B. 532 (1967). In Wagner, the union gave employees a five-hundred dollar life-insurance voucher in an effort to influence the outcome of the election. The Board observed that this pre-election grant of benefits resulted in the "enhancement of the employees' economic position" and thus was "akin to an employer's grant of a wage increase in anticipation of a representation election . . . [in that it] subjects the donees to a constraint to vote for the donor union." Id. at 533.

Although Wagner stands for the proposition that certain pre-election grants of economic benefit are inappropriate, the Board has carved out a niche for grants of benefit which, although of some economic value, are intended as mere propaganda and do not threaten to create a sense of obligation on the part of employees. The paradigm example of this is the distribution of pro-union buttons and bumper stickers, which cost the union something to distribute, but which the Board has never held to be inappropriate. See R.L. White Co., Inc., 262 N.L.R.B. 575 (1982).

In R.L. White, the union distributed T-shirts as part of its pre-election effort to generate support among employees. See id. at 576. The Board rejected the company's demand to set aside the election. See id. In the Board's view, the distribution of inexpensive T-shirts was part and parcel of a union's campaign effort and was unlikely to create a sense of obligation among employees:

> A party to an election often gives away T-shirts as part of its campaign propaganda in an attempt to generate open support among the employees for the party. As such, the distribution of T-shirts is no different than the distribution of buttons, stickers, or other items bearing a message or insignia. A T-shirt has no intrinsic value sufficient to necessitate our treating it differently than other types of campaign propaganda, which we do not find objectionable or coercive.

Id. Although R.L White might appear to suggest that economic value alone is dispositive, later decisions of the Board have indicated that

7

this is not the case. Instead, the Board has rather consistently applied a totality of the circumstances approach, which in addition to the value of the benefit conferred takes into account various other factors, such as the timing of the benefit, the number of employees to whom the benefit is granted, and the likelihood of the benefit being interpreted as a reward or inducement to vote for the union. See, e.g., Owens-Illinois, Inc., 271 N.L.R.B. 1235 (1984); Nu-Skin Int'l, Inc., 307 N.L.R.B. 223 (1992).

The totality of the circumstances approach is exemplified by the holding in Owens-Illinois. There, a union organizer handed out on election day approximately twenty-five jackets with union insignia to employees who came to his room at the Ramada Inn between the first and second voting sessions. See id. at 1235. Evidence showed that the jackets were valued at $16 a piece and that at least five or six employees who received a jacket had not yet voted in the election. See id. The Board ordered the election to be set aside. See id. In the Board's view, the totality of the circumstances suggested the potential for undue influence on the free choice of voting employees:

> [T]hese jackets were not given away during the preelection campaign but on election day itself; distributed as they were between voting sessions, they could well have appeared to the electorate as a reward for those who had voted for the [union] and as an inducement for those who had not yet voted to do so in the [union's] favor. . . .[Moreover,] the value of the jackets given away here far exceeds that of the items considered in R.L. White. Given all the circumstances of this case, we find the [Union's] distribution of these jackets was objectionable conduct.

Id. at 1235-36. These same principles were applied in Nu Skin Int'l, Inc., 307 N.L.R.B. 223 (1992), where the Board approved of the union's distribution of $4 "Union Yes" t-shirts at a union-hosted picnic the day before the election.

The principles elucidated in Owens and Nu Skin provide for ready disposition of the case at bar. For starters, the T-shirts distributed by the Union in the present case were of an essentially nominal value. Although the $6-$7 value of each shirt is slightly more than the value

8

of the T-shirts distributed in Nu Skin, it is nevertheless substantially less than the $16 value of the jackets the Board rejected in Owens. Next, the circumstances surrounding the distribution of the T-shirts militate against a finding of undue influence. Unlike in Owens, where the jackets were distributed on election day between voting sessions, in the present case the T-shirts were offered to employees at a meeting which occurred more than one month prior to the date of the election. This substantially reduced any danger that employees would feel a sense of obligation to vote for the Union.

Additionally, the T-shirts were not distributed to Coke employees in general, but were brought to the meeting at the request of employees who, all except for one, had already declared themselves to be the "Internal Organizing Committee" for the union representation effort. Finally, the Union placed no pressure on employees to take a T-shirt or to make a pledge to support the Union in the election. Instead, a box of T-shirts was placed at the back of the room and employees could take a shirt without having to make any representation of support for the Union.

In light of all these facts, we conclude that the distribution of T-shirts in this case was entirely appropriate, and the Company's request to set aside the election on this ground is denied.

V.

The Company's final objection concerns promises that were allegedly made by the Union regarding benefits to be received if the Union won the election. According to the Company, during the pre-election campaign Union officials attempted to "bribe" employees by "purchasing their vote[s]" with a promise that a Union victory in the election would automatically entitle them to participate in a union pension plan with ten years of credit advanced toward retirement.

It is well-settled that a union may not make pre-election promises of benefits to employees contingent on a union victory in the election. See Crestwood of Stockton, 234 N.L.R.B. 1097 (1978). In the instant case, the Board rejected as a factual matter the Company's claim that Union officials made the promises in question. We agree. Not a single employee among the eleven called by the Company to testify at the

9

hearing offered any evidence to support the Company's claim. Quite the opposite, each witness who testified on the matter stated that Union representatives had merely described the various pension benefits that might be obtainable, and had cautioned employees that pension benefits were not guaranteed and were subject to negotiation with the Company.

The only evidence in the record that even arguably supports the Company's position is the affidavit of employee Doug Diamond, in which Diamond swore that Union officials attending an organization meeting informed employees that they would be entitled automatically to receive a ten year credit toward a union pension plan if the Union were elected. However, when called to testify at the hearing, Diamond wholeheartedly contradicted his affidavit and testified that to his knowledge no Union official had ever made promises concerning benefits under a union pension plan. Given this testimony, we agree with the Board's decision to give "little weight" to Diamond's affidavit. The Board was, therefore, justified in refusing to set aside the election on this ground.

VI.

Accordingly, we cannot conclude that the Board's refusal to overturn the election was an abuse of discretion. We hold that the election was valid, that the Company had a duty to bargain with the Union, and that the Company's refusal to bargain constitutes an unfair labor practice. We therefore grant enforcement of the Board's order.

ENFORCEMENT GRANTED

10