**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

UNION OF NEEDLETRADES,
INDUSTRIAL AND TEXTILE EMPLOYEES,
AFL-CIO, CLC,

No. 98-1137

Intervenor,

v.

FLAMBEAU AIRMOLD CORPORATION,
Respondent.

On Application for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-17591)

Argued: October 26, 1998

Decided: May 26, 1999

Before WILKINS and NIEMEYER, Circuit Judges, and
BLAKE, United States District Judge for the
District of Maryland, sitting by designation.

_____

Petition for enforcement granted by published opinion. Judge Blake
wrote the majority opinion, in which Judge Wilkins joined. Judge
Niemeyer wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** David Arthur Fleischer, NATIONAL LABOR RELA-
TIONS BOARD, Washington, D.C., for Petitioner. John Raymond

Sapp, MICHAEL, BEST & FRIEDRICH, L.L.P., Milwaukee, Wisconsin, for Respondent. David Malcolm Prouty, UNITE, AFL-CIO, CLC, New York, New York, for Intervenor. **ON BRIEF:** Frederick L. Feinstein, Acting General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. Jonathan O. Levine, Mark E. Toth, MICHAEL, BEST & FRIEDRICH, L.L.P., Milwaukee, Wisconsin, for Respondent. Jonathan R. Harkavy, PATTERSON, HARKAVY & LAWRENCE, Greensboro, North Carolina, for Intervenor.

_____

**OPINION**

BLAKE, District Judge:

This case is before the court on the application of the National Labor Relations Board ("NLRB" or "Board") for enforcement of its November 1997 order requiring Flambeau Airmold Corporation ("Flambeau") to bargain with the Union of Needletrades, Industrial, and Textile Employees, AFL-CIO, CLC ("Union") as the exclusive collective bargaining representative of the employees at Flambeau's manufacturing facility located in Roanoke Rapids, North Carolina. Flambeau contends that it need not bargain with the Union because the certification election in which the Union prevailed was rendered invalid by a racially inflammatory rumor that spread throughout the plant the day before the election. Because we conclude that the Board's decision to certify the Union was reasonable and supported by substantial evidence, we enforce the Board's order.

I.

Flambeau operates a blow molding plastics plant in Roanoke Rapids, North Carolina. On March 22, 1996, the Union filed an election petition with the NLRB seeking to represent "[a]ll production, maintenance, shipping and receiving employees" at the plant. A secret ballot election under the Board's supervision was held at the plant on May 2, 1996. The Union won the election by 96 votes to 94 votes. Flambeau filed timely objections to conduct affecting the results of

the election. Pertinent to this proceeding, Flambeau contended that the Union had "made objectionable racial appeals during the initial pre-election period which interfered with the laboratory conditions necessary for a free and fair election." A hearing was held on June 12-13, 1996, before an NLRB Hearing Officer in order to resolve the issues raised by Flambeau's objections.

The evidence developed at the hearing revealed that on May 1, 1996, the day before the election, a rumor began to circulate among Flambeau's employees to the effect that during a supervisor's meeting held that morning, one of the white managers had referred to employees as "niggers." Two-thirds of Flambeau's approximately 200 employees are African-American, and the Union campaign had included what could be interpreted as appeals to racial solidarity.[1] The Hearing Officer found that the rumor had spread widely throughout the plant prior to the election, but that neither the source of the rumor nor its truth or falsity could be determined. The Hearing Officer further found that both pro-company and pro-Union employees, as well as both white and black employees, had contributed to the rumor's spread.

Flambeau's position is that this patently offensive rumor "made racial hatred an issue in the election" and "so inflame[d] the racial feelings" of the employees as to render the election fundamentally unfair. The Hearing Officer below disagreed. Applying a third-party conduct standard, the Hearing Officer concluded that, although the rumor "would upset any social[ly] conscious individual," it had not "destroyed the laboratory conditions necessary for a free and fair election" or "aggravate[d] the situation to the point of rendering a free election impossible." Accordingly, he recommended that Flambeau's objections to the election be overruled and that a certification of representative be issued. The Board adopted the Hearing Officer's findings and recommendations and certified the Union on April 8, 1997. In its decision, the Board held that "the rumored remark, and the circulation of the rumor on the day of the election, did not so inflame

_____

[1] As the dissent acknowledges, however, up until May 1, 1996, there was no evidence of any explicit racial appeals and no suggestion that the employees could not have exercised an uninhibited free choice.

3

and taint the atmosphere in which the election was held that a reasoned basis for choice was impossible."**2**

Thereafter, in order to obtain judicial review of the Board's decision, Flambeau refused to bargain with the Union. The Union responded by filing an unfair labor practices charge against the company. On November 7, 1997, the NLRB issued a Decision and Order finding that Flambeau's refusal to bargain with the Union violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5), (1). Since Flambeau continues to refuse to bargain with the Union on the grounds that it was improperly certified, the Board now seeks enforcement of its November 1997 order.

II.

The results of a Board-supervised representation election are presumptively valid. NLRB v. Columbia Cable T.V. Co., 856 F.2d 636, 638 (4th Cir. 1988). This presumption reflects Congress's decision to "entrust[ ] the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." NLRB v. A.J. Tower Co., 329 U.S. 324, 330 (1946). We may not substitute our judgment for that of the Board, even if we would have made a different decision had the matter been before us de novo. So long as the Board's decision is reasonable and based upon substantial evidence in the record considered as a whole, it must be upheld. See 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB , 340 U.S. 474, 488 (1951).

"The Board's stated goal in regulating the conduct of representation elections is to `provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees.'" Case Farms of North Carolina, Inc. v. NLRB, 128 F.3d 841, 844 (4th Cir. 1997) (quoting

_____

**2** We believe the dissent is in error when it asserts that in reaching this decision, the Board did not consider various factors that the Board traditionally has applied when determining the validity of representation elections, including the closeness of the vote and the timing of the misconduct in relation to the election. See Joint Appendix, p. 382.

4

General Shoe Corp., 77 N.L.R.B. 124, 127 (1948), enforced, 192 F.2d 504 (6th Cir. 1951)). Although the Board strives to maintain "laboratory conditions," a union election "by its nature is a heated affair," NLRB v. Herbert Halperin Distrib. Corp., 826 F.2d 287, 290 (4th Cir. 1987), and must be evaluated "in the light of realistic standards of human conduct," Case Farms, 128 F.3d at 844 (citation omitted).

Where pre-election conduct is alleged to have invalidated a representation election, the party seeking to overturn the election, in this case Flambeau, bears the heavy burden of proving by specific evidence not only that campaign improprieties occurred, but also that they prevented a fair election. NLRB v. Hydrotherm, Inc., 824 F.2d 332, 334 (4th Cir. 1987). In evaluating such a challenge, less weight will be afforded the comments and conduct of third parties than those of the employer or union. Herbert Halperin, 826 F.2d at 290.**3** In Herbert Halperin, which involved alleged threats of violence and job loss as well as "appeals to racial fears," we held that an election will be set aside for third-party misconduct "only if the election was held in a general atmosphere of confusion, violence, and threats of violence, such as might reasonably be expected to generate anxiety and fear of reprisal, to render impossible a rational uncoerced expression of choice as to bargaining representative.'" Id. (quoting Methodist Home v. NLRB, 596 F.2d 1173, 1183 (4th Cir. 1979)). This is an objective test that does not require the Board or the court to examine the individual thought processes of every employee who may have been influenced by the alleged third-party misconduct.

In this case, the Board found that neither Flambeau nor the Union was responsible for starting the unfortunate rumor at issue. Although supporters of both sides contributed to its circulation around the plant, this is an inadequate basis for attributing the rumor to either party.

_____

**3** Indeed, the dissent acknowledges the many valid reasons why it is essential to impose a higher standard for setting aside an election where third-party misconduct is involved, rather than conduct attributable to the party who may be benefitted thereby. As explained in Herbert Halperin: "The obvious reasons are that third parties are not subject to the deterrent of having an election set aside, and third party statements do not have the institutional force of statements made by the employer or the union." 826 F.2d at 290.

5

The Board's decision to treat the rumor as third-party misconduct, therefore, was reasonable and supported by substantial evidence. In light of the test for third-party misconduct enunciated in Herbert Halperin, supra, we agree with the Board that the rumor "did not so inflame and taint the atmosphere in which the election was held that a reasoned basis for choice was impossible." We acknowledge, as did the Board, that the vote was close, and that there was indirect evidence that one employee's vote may have been affected by the rumor. That is not sufficient, however, to invalidate the Board's conclusion, based on all the evidence, that the rumor did not make a free and fair election impossible.

Contrary to the dissent, we believe that the disposition of this case is directly controlled by our decision in Herbert Halperin. In Herbert Halperin, the company challenged the Board's decision to certify the union following an election "in which racial appeals and animosities allegedly played some part." Id. at 288. Among the third-party misconduct which occurred in that case were the comments "white sons-of-bitches" and "goddamn white boys" made by black pro-union employees about pro-management white employees. Id. at 289. The company argued that these and other similar comments warranted setting aside the election.[4] This court disagreed. While we condemned the employees' use of racial epithets, we nonetheless held that the comments did not "suggest an atmosphere inflamed by racial tension" or "reflect the combination of union involvement and racial, ethnic or religious prejudice that requires an election to be overturned." Id. at 292-93. We think a similar conclusion is required under the circumstances of the present case.

Accordingly, we hold that the Board's decision to certify the Union was reasonable and supported by substantial evidence in the record as a whole. The Board's petition for enforcement of its November 1997 order is granted.

IT IS SO ORDERED

_____
[4] We cannot agree with the dissent that the comments made in Herbert Halperin are any less an appeal to racial prejudice or an expression of bigotry than the use of the offensive epithet in this case.

6

NIEMEYER, Circuit Judge, dissenting:

The majority approves a representation election that was decided by a single vote in a context where it is virtually certain that a pernicious, racially inflammatory rumor, which circulated the day before the election, materially altered the outcome of the election. According to the rumor, a member of management, which was predominantly white, had, during a meeting on the day before the election, called the employees, who were predominantly black, "a bunch of niggers." If the facts of this case, which I describe in greater detail, below, do not meet virtually any standard for setting aside representation elections, I cannot conceive of any election that would be set aside because of racially inflammatory conduct.

To affirm the election, the majority has squeezed the facts of this case under the holding of a single, entirely inapposite case and has ignored more than 35 years of more relevant precedent from this court, from our sister circuits, and from published decisions of the National Labor Relations Board. When applying all of the relevant precedent, one can come to only one conclusion -- that the representation election in this case must be set aside.

Applying a standard derived from our precedent, as well as the precedent of other circuits and the National Labor Relations Board, I conclude that the rumor in this case (1) represented the type of conduct that would inevitably pollute the election atmosphere necessary for the exercise of choice and (2) undoubtedly altered the outcome of election in this case. Accordingly, I would deny the Board's application for enforcement of its order.

I

At a representation election conducted by the National Labor Relations Board ("NLRB") at Flambeau Airmold's plant at Roanoke Rapids, North Carolina, on May 2, 1996, the employees voted in favor of the Needletrades, Industrial and Textile Employees (the "Union"), 96 to 94. After the Board certified the Union as the exclusive collective-bargaining representative of the employees, Flambeau Airmold refused to bargain with the Union, contending that the election was not "free and fair." A Department of Labor hearing officer rejected

7

Flambeau Airmold's objections to the election, and the Board, by order dated April 8, 1997, affirmed the election and certified the Union as the employees' exclusive collective-bargaining agent. When Flambeau Airmold refused to bargain with the Union, the Board issued an order dated November 7, 1997, finding that Flambeau Airmold committed an unfair labor practice by refusing to bargain, in violation of §§ 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5), (1). 324 NLRB No. 162. On appeal to this court, the record of the Board certification proceedings was made part of the record in the unfair labor practice proceeding. See 29 U.S.C. § 159(d).

The facts of record are not disputed. The stipulated unit for the representation election at the Flambeau Airmold plant consisted of 200 employees, two-thirds of whom were African-American. The Union's campaign leading up to the election was conscious of this racial makeup. Union organizers maintained a record of each member-employee's race and conducted a campaign that invoked both Christian and civil rights messages. Literature circulated on behalf of the Union contained numerous citations to the Bible as well as references to class struggle and the inequity between rich and poor, alluding to management as masters and employees as workers who "slaved" for the company. One circulated letter quoted the New Testament, "Masters, give unto your servants that which is just and equal; knowing that ye also have a Master in heaven." Another letter stated, "Where is the respect for the older workers that have slaved so hard for the company and their customers." Union supporters circulated letters to employees from the Reverend Jesse L. Jackson and from the Ministerial Alliance for Concerned Citizens. They also circulated letters referring to Martin Luther King, Jr., Malcolm X, Abraham Lincoln, and John F. Kennedy. One pro-Union leaflet referred to Flambeau Airmold's general manager as "`Good Ole' Bill Budzien," and another appeared to mock Flambeau Airmold by implying that it wanted its employees to have the following "Qualifications: Weak minds, Strong backs, Easily controlled, Dedicated to Bill Budzien, Pro management, High School Diploma (optional)."

The Union also produced a campaign videotape which showed statements by a number of Flambeau Airmold employees, all of whom were African-American. It contained footage of African-

8

American children and adults going to church, statements by three African American ministers, including Jesse Jackson, who cited Martin Luther King and Jesus. It also showed statements by white workers at other plants that were unionized, talking about how their jobs were better because of unionization. The video combined an appeal to racial solidarity with appeals based on religion and implied promises that a union would improve wages and working conditions.

For the period before May 1, 1996, however, the record contains no evidence of any explicit racial appeals and none of the parties suggests that the employees could not, up until then, have exercised an uninhibited free choice.

On May 1, 1996, however, one day before the election, the circumstances changed. On that day, a rumor circulated at the plant that, at a supervisors' meeting that morning, a white manager had referred to the employees as "a bunch of niggers." The rumor, which circulated quickly and widely, took on different forms. One employee testified that she was told that plant employees "were almost called a bunch of niggers." Another employee heard that the word "nigger" was used in a supervisors' meeting. Another employee testified that a co-worker told her that "he heard, in the supervisors' meeting that [a manager] had said the N word." No one knows who started the rumor, and no evidence was presented that there was any truth to the rumor. Indeed, the meeting at which the racial slur was reputed to have been used was attended by an African-American manager who testified that no such remark was made.

By the time that the election occurred, virtually every employee knew about the rumor. One pro-Union employee testified that she had not heard of the rumor, but the hearing officer refused to credit that testimony. Some of the employees believed the rumor to be true while others believed it to be false. Plant management also learned of the rumor, but made an apparently strategic decision not to "mess with it."

At the hearing on Flambeau Airmold's objections to the election, the hearing officer suppressed testimony as to how the rumor affected employees' votes. During Flambeau Airmold's efforts to introduce such evidence, he stated:

9

Listen, I have directed the -- Mr. Beightol, the counsel for the Employer, to not ask questions that would reveal[the witness'] sentiments toward unionization, changing her mind at any time or what she conveyed to anyone as it relates to her feelings toward unionization. I do not see the relevancy of that. We're interested in this rumor and this rumor alone.

Notwithstanding the hearing officer's position on this type of evidence, testimony was received without objection from an employee in the unit, Carolyn Banks, that at least one employee in the unit changed her vote because of the rumor. Banks reported a conversation she had with Shirley High in which High indicated that she changed her vote because the rumor was "the last straw for her."

In his findings of fact, the hearing officer did not refer to the testimony of Carolyn Banks, which provided evidence that Shirley High changed her vote. But otherwise he summarized fully the testimony of the witnesses and concluded that the "material facts" were not in dispute. He found that "an unidentified individual" caused the rumor to circulate on May 1 after the supervisors' meeting ended at 10:00 a.m. He found that no evidence established the origin of the rumor but that it nonetheless was "widely disseminated in the plant." He noted that "some employees who were open union supporters contributed to the circulation of this rumor, but the evidence[did] not support a finding that these employees were agents of the union during this campaign." Accordingly, the hearing officer concluded that the conduct was not "attributable to either the petitioner or the Employer and there is no finding that the rumor was either true or false." But the officer found it undisputed that "a rumor alleging that a company official called employees `niggers' would upset any social[ly] conscious individual." He continued, "The word `nigger' is demoralizing, degrading, and naturally offensive." The officer concluded, however, that the rumor did not "aggravate the situation to the point of rendering a free election impossible." He accordingly recommended overruling Flambeau Airmold's objection.

On appeal to the NLRB, the Board adopted the factual findings of the hearing officer and agreed with his recommendation. In doing so, the Board applied the following standard in upholding the election:

10

> We also agree with the hearing officer that the employees' circulation of the rumor did not, under the circumstances, create an atmosphere of fear and coercion such that <u>a free and fair election was not possible</u>. . . . The evidence presented by the Employer of the employees' pre-election-day circulation of the rumor here does not rise to the level of a "<u>sustained appeal to racial prejudice</u>." . . . Moreover, the rumored remark, and the circulation of the rumor on the day of the election <u>did not so inflame and taint the atmosphere in which the election was held that a reasoned basis for choice was an impossibility</u>.

(Emphasis added).

II

Flambeau Airmold contends on appeal that the Board failed to take a proper account of the facts by employing the wrong legal standard for determining whether the representation election was accurate in determining the desires of the employees. It does not challenge the hearing officer's factual findings, but only the application of those findings to the law.

In upholding the election, the Board applied a standard which required it to find that the third-party conduct rose to the level of a "sustained appeal to racial prejudice" which so "inflamed and tainted" the atmosphere before the election that any "reasoned basis for choice was an impossibility," or which so created "an atmosphere of fear and coercion such that a free and fair election was not possible." In applying this standard, the Board did not consider the factors that it had applied over the years when determining the validity of elections. These factors include (1) the closeness of the vote, (2) the timing of the misconduct in relationship to the election, (3) the extent to which the knowledge of the misconduct was disseminated among eligible voters, (4) the seriousness of the misconduct, and (5) the degree of persistence of the misconduct in the minds of the eligible voters. <u>See</u>, <u>e.g.</u>, <u>Phillips Chrysler Plymouth, Inc.</u>, 304 NLRB 16, 16 (1991).

When reviewing a Board decision to uphold a certification election, we reverse only if the Board has abused its discretion. <u>See Case</u>

11

Farms of North Carolina, Inc. v. NLRB, 128 F.3d 841, 844 (4th Cir. 1997); Industrial Acoustics Co. v. NLRB, 912 F.2d 717, 719 (4th Cir. 1990). The Board, however, is bound to follow the law as set forth by the relevant court of appeals, see Industrial Turnaround Corp. v. NLRB, 115 F.3d 248, 254 (4th Cir. 1997), and we review the legal conclusions of the Board and its hearing officers de novo. See NLRB v. C.W.I. of Maryland, Inc., 127 F.3d 319, 330 (4th Cir. 1997). In short, where the Board has made a legal error, we are required to correct it. See Virginia Concrete Co. v. NLRB, 75 F.3d 974, 980 (4th Cir. 1996).

The Board's stated goal in regulating the conduct of representation elections is to "provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." Case Farms, 128 F.3d at 844 (citation omitted). The Board has also recognized that such laboratory conditions are made impossible by electoral propaganda, appeals, or arguments which are intended solely "to inflame the racial feelings of voters in the election." Sewell Manufacturing Co., 138 NLRB 66, 71 (1962). Indeed, it is self-evident that racial appeals, whether in union campaigns or in broader contexts, pollute the atmosphere necessary for a free and rational election because, when unrelated to an election campaign issue, they can only have the effect of inflaming passions and distorting the sober, informed exercise of the franchise. See NLRB v. Schapiro & Whitehouse, Inc., 356 F.2d 675, 679 (4th Cir. 1966) (vacating a representation election because the union's "call upon racial pride or prejudice in the contest could `have no purpose except to inflame the racial feelings of the voters in the election'"); see also Schneider Mills, Inc. v. NLRB, 390 F.2d 375, 379-80 (4th Cir. 1968) (invalidating an election in which union literature compared the company's president to Hitler).

The facts of Schapiro & Whitehouse demonstrate the breadth of the Sewell doctrine and our application of it. In that case, the NLRB certified a representation election, but we denied enforcement because of relatively mild racial appeals contained in two leaflets distributed by the union during the election campaign. One leaflet stated that "the people at Cambridge didn't get scared nor did they give up because their friends were arrested." Id. at 678. This reference to Cambridge, we noted, "was an allusion to recent racial strife there." Id. at 679.

12

The second leaflet contained a newspaper article describing how a black member of the Maryland House of Delegates had criticized other black leaders for demonstrating for "social rights" while over-looking "the real Negro problem of unfair employment practices." Id. In overruling the NLRB, we stated:

> This type of propaganda is deplorable. . . . Equality of race in privilege or economic opportunity was not presently an issue. That a majority of the employees were Negroes did not make it so. For the union to call upon racial pride or prejudice in the contest could "have no purpose except to inflame the racial feelings of voters in the election."

Id. (quoting Sewell, 138 NLRB at 71).

Accordingly, both the Board in Sewell and this court in Schapiro & Whitehouse have concluded that when a party to a representation election wins the election based on its appeal to racial prejudice on matters unrelated to election issues, the election must be set aside. As the Board admonished in Sewell and we adopted in Schapiro & Whitehouse,

> The Board does not intend to tolerate as "electoral propaganda" appeals or arguments which can have no purpose except to inflame the racial feelings of voters in the election.

356 F.2d at 679 (quoting Sewell, 138 NLRB at 71).

In this case, however, the Board found no evidence that either of the parties had engaged in race-based misconduct. Neither Flambeau Airmold nor the Union initiated the rumor, although supporters on both sides apparently spread it. But the Board observed, this is an inadequate basis to attribute the conduct to either Flambeau Airmold or the Union. When we cannot attribute race-based misconduct, in this case the initiation of a pernicious rumor, to a party but only to a third party, we apply a higher standard for setting aside an election. As we explained in NLRB v. Herbert Halperin Distributing Corp., because "third parties are not subject to the deterrent of having an election set aside and third-party statements do not have the institu-

13

tional force of statements made by the employer or the union," "[l]ess weight is accorded the comments and conduct of third parties than to those of the employer or union." 826 F.2d 287, 290 (4th Cir. 1987) (citation omitted). Moreover, in the absence of a heightened threshold, third parties or even parties themselves might be tempted to create anonymous incidents in attempts to set aside an election. See Bush Hog, Inc. v. NLRB, 420 F.2d 1266, 1269 (5th Cir. 1969). Although the more relaxed Sewell standard for setting aside elections bars parties from making inflammatory race-based appeals by denying them the benefit of an election victory, it could, if applied to third-party conduct, lead to an endless cycle of elections because interested employees could repeatedly undermine elections by spreading inflammatory, race-based rumors. Because it would be impossible to know which side a third party favored, secretly pro-company employees could spread inflammatory rumors favorable to the union, thus invalidating the union's anticipated victory, and vice versa.

Even though we have not yet specifically addressed the issue of race-based appeals introduced by third parties during representation election campaigns, the majority holds that the standard we applied in Halperin -- that an election need not be set aside unless "an atmosphere of fear and coercion rendered free choice impossible" -- applies to this case because in Halperin racial conduct "played some part." This application of Halperin is fundamentally in error. Halperin did not turn on the existence of racially inflammatory conduct. It recognized that conduct is not classified as racially inflammatory simply because race is mentioned. Rather, our precedent makes amply clear that conduct is racially inflammatory only if there is an appeal to the racial prejudice of the workers or an accusation that management or the union is bigoted. See Case Farms, 128 F.3d at 846. Thus, when a union has appealed to workers' racial prejudice or has compared a manager to Hitler, we have set aside elections, see Schapiro & Whitehouse, 356 F.2d 675; Schneider Mills , 390 F.2d 375, but when there was "no appeal to racial prejudice, and[no] accus[ation] of bigotry," although there was much mention of ethnicity, we have declined to set aside an election, Case Farms , 128 F.3d at 846.

The conduct at issue in Halperin was clearly conduct that was not racially inflammatory. While the majority states that Halperin involved "appeals to racial fears" or to "racial prejudice," those

14

phrases appear in the Halperin opinion only with regard to what the employer in that case alleged. See Halperin, 826 F.2d at 288, 289, 290. We rejected those characterizations, noting that the comments "constitute[d] little more than isolated remarks and name-calling among co-workers." Id. at 292. They were made by a couple of employees about their co-employees and did not charge management or the union with racial prejudice. Even a cursory look at the three racial comments that were at issue show that they did not appeal to racial prejudice or accuse management of bigotry. One black employee allegedly stated that "the white guys should get together and help the black guys because you'll lose your jobs by not signing union cards." Id. at 289. Another black employee allegedly told a white employee, "Boy, you white sons-of-bitches, you are all the same, you're scared to take a stand," and was overheard saying "those Goddamn white boys -- they're gonna vote no [on the union], they won't support the blacks." Id.

These comments were obviously not designed to appeal to anyone's racial prejudice or to accuse anyone of bigotry. If anything, they demonstrated the speakers' own anti-white prejudice, and this demonstration would clearly not have appealed to any prejudice of the white listeners. As we concluded in Halperin, these remarks "were not directed at the owners and do not reflect an attempt to win the election by creating animosity along religious or racial lines." Id. at 293 n.2. Moreover, the remarks did not "represent a deliberate attempt by the union to divert the employees from legitimate issues by insinuating an irrelevant appeal to race." Id. at 293. We did imply, however, that if there had been an appeal to racial prejudice, the standard in NLRB v. Katz, 701 F.2d 703 (7th Cir. 1983), would be applicable. Id. at 292. That case, as I discuss below, sets a much lower threshold for overturning a representation election than was applied to the alleged coercion actually considered in Halperin.

The facts in this case are materially different from those in Halperin. The misconduct in this case -- a false accusation, circulated on the eve of the representation election, that a manager referred to the employees as a "bunch of niggers" -- was most clearly an accusation of racial bigotry. It was directed at management; it was an attempt to win the election by creating animosity along racial lines; and it was an attempt "to divert the employer from legitimate issues

15

by insinuating an irrelevant appeal to race." Moreover, the rumor was inflammatory, as the hearing officer found. Thus, this case can only be analyzed as one which involves the type of race-based inflammatory conduct that this court and the NLRB have long deplored and have consistently found justifies setting aside elections.

While we have not specifically addressed the standard to apply to racially inflammatory conduct when it is introduced into an election campaign by third parties, other circuits have. For instance, in NLRB v. Katz, the Seventh Circuit adopted a low threshold for setting aside the elections when they were tainted by third-party racial influence. The court held that a new election would have to be ordered when third-party, racially "inflammatory remarks could have impaired the employees' freedom of choice in the subsequent election." Katz, 701 F.2d at 705, 707 (emphasis added and citation omitted) (finding a prima facie case for overturning an election in which a priest, who was not a union agent, stated that workers should vote for the union because the company's owners were Jewish and "Jewish people are rich and we are poor and killing ourselves for them"). Similarly, the Eleventh Circuit has adopted a standard giving little tolerance to racially inflammatory conduct. In M&M Supermarkets, Inc. v. NLRB, 818 F.2d 1567 (11th Cir. 1987), the court held that third-party racial remarks will warrant setting aside an election "if the acts disrupted the voting procedure or destroyed the atmosphere necessary to the exercise of free choice in the representation election." Id. at 1572 (emphasis added). The court in M&M invalidated an election in which an employee stated, "Us Blacks were out in the cotton fields while they, the damn Jews, took their money from the poor hardworking people." Id. at 1569.

Keeping in mind the Board's goal of conducting representation elections which accurately report the "uninhibited desires of the employees," Case Farms, 128 F.3d at 844, I would nevertheless conclude that the Seventh Circuit standard, which authorizes setting aside an election when an inflammatory remark "could impair" an employee's freedom of choice, Katz, 701 F.2d at 707, might be too broad and would require invalidation of virtually every election in which third-party race-based conduct is present. Any inflammatory comment "could impair" the exercise of free choice. To accept this standard, which would essentially extend the "zero tolerance" of Sewell to

16

third-party conduct, would fail to take into account the reasons that we have already recognized for imposing a higher standard when third-party conduct is involved. Indeed, the Seventh Circuit itself may be withdrawing from the low threshold of its Katz holding. Recently in Clearwater Transport, Inc. v. NLRB, 133 F.3d 1004 (7th Cir. 1998), the court, while purporting to apply Katz , seemed to impose a higher standard. The court ruled against an employer's challenge to a representation election because the employer "did not provide any evidence that [an employee's] remark [calling the employer's owner a "Jewish son of a bitch"] had an effect on the election." Id. at 1011 (emphasis added). Thus, in Clearwater, the Seventh Circuit seemed to require that a party challenging a representation election show that a third-party race-based remark actually had an effect on the election rather than, as Katz held, that the remark could have had an effect on voter free choice.

The Eleventh Circuit standard, requiring only that the atmosphere for free choice be destroyed, also fails sufficiently to take into account arguments made by both the Board and the Union in this case. For instance, if the court were too willing to strike down elections based upon third-party conduct, a company or union that expected to lose an election could start an inflammatory rumor detrimental to itself, disguising the rumor as third-party conduct, and then use the rumor to challenge the election.

For these reasons, I believe that it would be more consistent with the Board's standards for conducting elections to adopt a two-prong approach which, while maintaining a low threshold when racial prejudice is involved, would, to a degree, shift emphasis to a greater consideration of the actual prejudice caused by third-party race-based inflammatory conduct. Accordingly, I would require a new representation election based on third-party race-based inflammatory conduct when (1) the conduct was of the type that would pollute the atmosphere necessary for the exercise of free choice, and (2) the overall circumstances suggest that, more likely than not, the conduct altered the outcome of the election. This standard is proportional to the one that we adopted when evaluating non-inflammatory conduct by a party:

> To succeed [in setting aside an election], it must be shown by specific evidence that (1) the alleged acts did in fact

17

occur, and (2) such acts sufficiently inhibited the free choice of employees so as to affect materially the results of the election.

NLRB v. Coca-Cola Bottling Co., 132 F.3d 1001, 1003-04 (4th Cir. 1997) (citation and internal quotation marks omitted). My two prong approach for third-party, race-based inflammatory conduct also draws on both the Eleventh Circuit's standard that the conduct have "destroyed the atmosphere necessary to the exercise of free choice" and the Seventh Circuit's now apparent requirement that the conduct have had an effect on the outcome of the election. Moreover, it would fill the open gap in our jurisprudence for racially inflammatory conduct by a third party.

Thus, where there is racially inflammatory conduct by a party and that party wins the representation election, the Sewell doctrine would be invoked and the election overturned. Where there is alleged misconduct of a different type by a party and that party wins the representation election, the Coca-Cola Bottling standard applies, and the election would be overturned if the other party demonstrates that the misconduct "affect[ed] materially the results of the election." 132 F.3d at 1004. Where there is third-party misconduct in the form of threats and intimidation, the election would be set aside if the conduct was "sufficiently substantial in nature to create a general environment of fear and reprisal such as to render a free choice of representation impossible." Methodist Home, 596 F.2d at 1183; see also Halperin, 826 F.2d at 290. And where, as here, there is third-party misconduct that is inflammatory race-based, the election would be set aside if (1) the conduct was of the type that would pollute the atmosphere necessary for the exercise of free choice, and (2) the overall circumstances suggest that the conduct more likely than not affected the outcome of the election.

III

With this standard, I now turn to the facts of this case to determine whether the race-based rumor initiated by a third party at Flambeau Airmold's Roanoke Rapids' plant was of the type that would pollute the atmosphere necessary for the exercise of free choice and whether

18

it, more likely than not, altered the outcome of the May 2, 1996 representation election.

I begin with the undisputed facts that provide the backdrop for this representation election. The unit of employees being polled was two-thirds African-American and the Union's campaign was cognizant of this racial make up, aiming its message at African-Americans. Management was referred to as the "masters," and their allegedly under-paid employees were said to be "slaving" for the masters. The general manager of the plant, who was white, was referred to as "`Good Ole' Bill Budzien," and African-American heroes were drawn on to urge the Union cause. Civil rights leader Jesse Jackson sent a letter to the employees urging their support for the Union, and the words and actions of Martin Luther King, Jr. and Malcolm X were recounted to employees. While no explicit appeals for racial voting were made, the overall effect of the Union's efforts was to make the campaign racially sensitive, suggesting that a black employee would be voting consistently with African-American causes by voting in favor of the Union.

It was against this backdrop that the rumor about white management calling the employees at the plant "a bunch of niggers" circulated throughout the plant one day before the election. By all accounts, including the hearing officer's factual findings, this rumor was widespread and generated much emotion among the employees. Racial prejudice was at this last, important moment explicitly appealed to. Such a rumor could only have the tendency to divide management from its employees and to unite employees, particularly African-Americans, in collective action against their employer.

Management was at a loss as to how to react in order to neutralize the rumor's effect, and its means for retrieving reason were limited. It was bound by an NLRB rule which prohibits employers and unions "from making election speeches on company time to mass assemblies of employees within 24 hours before the scheduled time for conducting an election." Peerless Plywood Co., 107 NLRB 427, 429 (1953); see also Kalin Construction Co., 321 NLRB 649, 651 (1996) (reiterating and extending the Peerless Plywood rule). Similarly, the employees, some of whom testified that they believed the rumor, had no way of evaluating the rumor for truthfulness. If the rumor had been a con-

19

clusory opinion -- for example, that "the general manager is a racist" -- then it might have been possible for employees to apply their knowledge of the manager and evaluate whether they agreed or disagreed with the assertion. But when the rumor made an assertion of historical fact -- that the general manager or another manager described the employees as "niggers" -- it was impossible for an employee to evaluate whether such a statement was made absent independent knowledge of the facts. In this case, no employee had independent knowledge of what the managers had said in their meeting. The hearing officer found that while some employees believed the rumor to be false, others believed it to be true.

Applying the first prong of the standard at hand-- whether this conduct was of the type that would pollute the atmosphere necessary for the exercise of free choice -- compels a different conclusion from that reached by the Board under its standard requiring that free choice be impossible. In the context of this election campaign in which racial issues were important to all parties, an eleventh-hour rumor that a white manager during a management meeting had referred to employees as "niggers" could have no other effect than polluting the atmosphere necessary for the exercise of free choice.

Under the second prong of the standard, a probability of prejudice must also be demonstrated: it must appear more likely than not that the conduct altered the outcome of the election. In making this determination, we should consider a number of factors relevant to the conduct including (1) the closeness of the vote, (2) the timing of the conduct in relationship to the election, (3) the extent to which knowledge of the conduct was disseminated among the eligible voters, (4) the seriousness of the misconduct at issue, and (5) the degree of the persistence of the conduct in the minds of eligible voters. See Phillips Chrysler Plymouth, Inc., 304 NLRB 16, 16 (1991).

The Union won the election by a vote of 96 to 94. One changed vote would have tied the election vote at 95 to 95, giving Flambeau Airmold a victory and altering the election's outcome. It is inconceivable that from among 190 persons voting, not one was moved by so pernicious a rumor circulated in so racially sensitive an atmosphere. Even though the hearing officer did not permit evidence of the rumor's effect on the votes of individuals, denying Flambeau Airmold

20

its effort to present such evidence, there nevertheless was evidence in the record that at least one employee did change her vote in favor of the Union because of the rumor. Shirley High, an African-American who had indicated that she was voting against the Union, told a fellow employee after hearing the rumor that she was going to vote for the Union; "that was it [the last straw] for her."

The vote in this election was extremely close; racial feelings and cohesion were closely tied to campaign issues; the rumor that circulated was a wicked, racial slur drawing on the most emotional appellation that could divide a majority white management from a majority black workforce; it was circulated close to the time of the election -- one day before; and it was widely circulated. Thus, the application of the relevant factors that have been identified compels the conclusion that third-party conduct more likely than not altered the election's outcome.

Unlike most other external influences during a representation election, racially inflammatory conduct both blinds and distorts through substantially heightened emotions, destroying the process by stripping away the sober, informed exercise of the franchise. This is especially true given the racial history in the United States, and particularly North Carolina.

Up until today, this court has been unwilling to sanction racially inflammatory conduct in union representation elections. Today, the court abandons that policy and rewards such conduct. More unfortunately, the majority's opinion encourages if not licenses, employees in future elections -- both those favoring unionization and those favoring management -- to engage in appeals to racial prejudice and accusations of bigotry.

Because the representation election at the Flambeau Airmold plant on May 2, 1996, was fatally tainted, I would conclude that the Board may not rely on it to compel Flambeau Airmold to bargain with the Union so elected. Accordingly, I would deny enforcement of the Board's application in this case.

21